# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BLAKE POUNDS, *et al.*, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-06-0527 |
| | § | |
| KATY INDEPENDENT SCHOOL | § | |
| DISTRICT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Like many public school districts, the Katy Independent School District ("KISD") regulates speech by and to students when they are in school.  The plaintiffs, parents of students attending a KISD elementary school, allege that during 2002 to 2006, teachers and the principal at this elementary school prevented the children from speaking about their Christian religious beliefs and from distributing religious items or literature with a Christian message at the school.  The plaintiffs allege that the KISD policy on student distribution of nonschool materials on school campuses violates the First Amendment, both facially and as applied.  The plaintiffs allege that the KISD policy and practices violate the First Amendment by restricting religious speech.  The plaintiffs also assert claims under the Due Process Clause, the Equal Protection Clause, and Texas law.  The plaintiffs seek to enjoin KISD from prohibiting students from "distributing literature or other items containing a message from

a religious viewpoint during noninstructional time" at the elementary school the plaintiffs'

children attended and at other KISD schools.

The parties agreed to litigate the case in stages.  The first stage requires this court to

decide whether the written KISD policy on student distribution of "nonschool literature" on

school campuses is facially unconstitutional.  The parties have agreed to defer the second

stage, the determination of whether this KISD policy is unconstitutional as applied and

whether KISD has other practices that unconstitutionally limit students' religious speech,

until the facial challenge is resolved.

The policy, "Student Expression: Distribution of Nonschool Literature" (the "FNAA

(Local)" policy), applies in relevant part to students who want to distribute more than ten

copies of nonschool material on school campuses or other district property.  The plaintiffs

have moved for partial summary judgment on their claim that the FNAA (Local) policy is

facially unconstitutional.  (Docket Entry No. 21).[1]  The defendants have cross-moved for

partial summary judgment that the FNAA (Local) policy is facially constitutional.  (Docket

Entry No. 21).  The plaintiffs responded to the KISD partial summary judgment motion,

(Docket Entry No. 22); the defendants responded to the plaintiffs' summary judgment

motion, (Docket Entry No. 23); the plaintiffs replied to the defendants' response, (Docket

---

[1]  The plaintiffs also challenged another KISD policy known as EMI (Local).  EMI (Local) sets out the school district's policy on the study of religion.  This policy states that "[t]he District's approach to teaching about religion shall be academic, not devotional" and includes specific provisions on the use of religious texts, music, and symbols in the classroom.  (Docket Entry No. 21, Ex. E).  The parties have agreed that this challenge is properly addressed in the application phase of the lawsuit.  The parties do not ask the court to rule on whether the EMI (Local) policy is facially constitutional.  (Docket Entry No. 22, p. 1 n. 2).

2

Entry No. 24); and the defendants replied to the plaintiffs' response, (Docket Entry No. 25). Both sides submitted additional briefing after the Supreme Court's decision in *Morse v. Frederick*, 127 S.Ct. 2618 (2007), (Docket Entries No. 30, 31).[2]

Based on the pleadings; the motions, responses, and replies; the parties' submissions; and the applicable law, this court denies the plaintiffs' motion for partial summary judgment and grants the defendants' motion, finding that the KISD FNAA (Local) policy is facially constitutional.  The reasons for this ruling are explained in detail below.  Given this ruling, the parties are to submit a proposed scheduling order to resolve the remaining "as-applied" challenges to the KISD FNAA (Local) policy and practices, no later than **October 5, 2007**.

## I.    Background

In February 2006, the plaintiffs filed a petition for a temporary restraining order in Texas state court.  In their petition, the plaintiffs alleged that their children, who attended Pattison Elementary School in the KISD, were prevented from discussing their Christian religious beliefs and prevented from distributing religious literature and items to other students while at school.  (Docket Entry No. 1, Ex. A).  The plaintiffs brought their claims under 42 U.S.C. § 1983, arguing that KISD policy and practices violated the students' First Amendment free-speech rights, the Establishment Clause of the First Amendment, the Free Exercise Clause of the First Amendment, the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment.  (*Id.*).  The

---

[2]   The plaintiffs have also moved to strike evidence submitted in KISD's reply to the plaintiffs' motion for partial summary judgment as irrelevant because it relates to postenactment justification for the KISD policy. (Docket Entry No. 26).  KISD responds that the evidence is relevant and admissible.  (Docket Entry No. 27).  As set out below, the court does not rely on this evidence, making the motion to strike moot.

plaintiffs alleged that KISD "favor[ed] non-religion over religion by forbidding and punishing religious speech and favoring non-religious speech." (Docket Entry No. 1, Ex. A at 34).[3]

The issue now before the court is the facial constitutionality of the KISD FNAA (Local) policy on "Distribution of Nonschool Literature." The policy states as follows:

_____

[3] The plaintiffs' complaint describe a number of incidents. The first is that a child who wanted to talk about God in a kindergarten-class discussion of the September 11, 2001 attacks was told by her teacher that she was not allowed to discuss God at school. (Docket Entry No. 1, Ex. A at 13). During the 2002-2003 academic year, a child in the third grade brought Christian "faith bracelets" to school to pass out to her non-Christian friends at recess to "tell them about Jesus and ask them if they would go to church." (*Id.* at 14-15). The principal told the child to stop giving out the bracelets and told her to collect the ones already distributed because of the religious message. (*Id.*). In December 2002 and 2003, the principal told the homeroom mothers organizing the school party that the phrase "Merry Christmas" could not be used; that the colors red and green were not permitted; and that no religious symbols could be used. (*Id.* at 25-26). The plaintiffs allege that although their children were instructed on religious symbols and songs of other faiths, they were prohibited from using Christian songs and symbols during the holiday season. In 2002, parents participated in a school fundraiser by ordering holiday cards made from their children's artwork. (*Id.* at 16-17). The cards included secular messages and non-Christian religious messages, but no religious Christian message. In the 2002 academic year, kindergarten homeroom mothers were told that while parents were invited to visit the kindergarten class and read from a book of their choice, religious books were not permitted. (*Id.* at 17). In April 2005, a first grade child was reprimanded by a teacher for talking about Jesus (rather than eggs and jellybeans) in a classroom discussion about Easter. (*Id.* at 18). In December 2004, a third grader was reprimanded by a teacher for not singing non-Christian songs that were part of the holiday concert. (*Id.* at 19-20). In January 2005, another third-grade child was reprimanded by this same teacher for talking to a Jewish friend about Jesus during recess and inviting the friend to come to church. (*Id.* at 20).

In February 2006, the Texas state court issued a TRO that enjoined the defendants from interfering with or prohibiting students from distributing religious viewpoint gifts and messages to classmates at school Valentine's Day parties and other non-instructional times and from interfering with or prohibiting students from voicing their religious viewpoints during class discussions and writing assignments in appropriate contexts and during non-instructional time. (Docket Entry No. 1, Ex. B at p. 2-7). The event that led to the TRO was the February 2006 Valentine's Day party. The 2005 Homeroom Mothers' Booklet for Pattison Elementary stated that only three school-sponsored parties were allowed during the 2005-2006 academic year: the "Special Deliveries-Be a Fred" party (December 16, 2005); the "Valentine's Day" party (February 14, 2006); and the "Fifth Grade Only Sock Hop" (February 14, 2006). (Docket Entry No. 1, Ex. A at 31). The plaintiffs sought a TRO to enjoin the KISD from preventing their children from distributing religious-themed cards during the Valentine's Day party. (*Id.*). The plaintiffs allege that after the TRO issued, in April 2006, a second grader was forbidden by the principal from distributing fewer than ten copies of Christian religious tracts, despite the child's willingness to do so outside of class hours. (Docket Entry No. 12, p. 21-23). The plaintiffs allege that children have been ostracized and criticized in retaliation for their parents' complaints to the school teachers and administrators. (*Id.* at 31).

4

Written or printed materials, handbills, photographs, pictures, films, tapes, or other visual or auditory materials not sponsored by the District or by a District-affiliated school-support organization shall not be sold, circulated, distributed, or posted on any District premises by any District student, except in accordance with this policy and the administrative regulation at FNAA.

The District shall not be responsible for, nor shall the District endorse, the contents of any nonschool literature distributed by students.

For purposes of this policy, "distribution" means the circulation of more than ten copies of material from a source other than the District.

Materials distributed under the supervision of instructional personnel as a part of instruction or other authorized classroom activities shall not be considered nonschool literature and shall not be governed by this policy.

[For distribution of nonschool literature by nonstudents, see GKDA]

LIMITATIONS ON CONTENT:

Nonschool literature shall not be distributed by students on District property if:

1. The materials are obscene, vulgar, or otherwise inappropriate for the age and maturity of the audience.
2. The materials endorse actions endangering the health or safety of students.
3. The distribution of such materials would violate the intellectual property rights, privacy rights, or other rights of another person.
4. The materials contain defamatory statements about public figures or others.
5. The materials advocate imminent lawless or disruptive action and are likely to incite or produce such action.
6. The materials are hate literature or similar publications that scurrilously attack ethnic, religious, or racial groups or contain content aimed at creating hostility and violence; and the materials would materially and substantially interfere with school activities or the rights of others.
7. There is reasonable cause to believe that distribution of the nonschool literature would result in material and substantial interference with school activities or the rights of others.

5

PRIOR REVIEW

All nonschool literature intended for distribution by students on school campuses or other District premises under this policy shall be submitted to the principal or designee for prior review in accordance with the following:

1.   Materials shall include the name of the person or organization sponsoring the distribution.

2.   Using the standards found in this policy at LIMITATIONS ON CONTENT, the principal or designee shall approve or reject submitted materials within two school days of the time the materials were received.

EXCEPTIONS TO PRIOR REVIEW

Prior review shall not be required for distribution of nonschool literature by District students only in the following circumstances:

1.   Distribution of materials by a student to other attendees during a meeting of a noncurriculum-related student group authorized to meet at school during noninstructional time in accordance with FNAB(LOCAL); or

2.   Distribution of nonschool materials in circumstances for which exceptions to prior review are authorized at GKDA(LOCAL).

TIME, PLACE, AND MANNER RESTRICTIONS

Each campus principal shall designate times, locations, and means by which nonschool literature that is appropriate for distribution, as provided in this policy, may be made available or distributed by students to students or others at the principal's campus. [See FNAA(REGULATION)].

The Superintendent or designee shall designate times, locations, and means for distribution of nonschool literature by students at District facilities other than school campuses, in accordance with this policy.

VIOLATIONS OF POLICY

Failure to comply with this policy regarding distribution of nonschool literature shall result in appropriate administrative action, including but not limited to confiscation of nonconforming materials, suspension of a noncurriculum-related student group's use of District facilities, and/or other disciplinary action in accordance with the Student Code of Conduct.

APPEALS

Decisions made by the administration in accordance with this policy may be appealed in accordance with FNG(LOCAL).

6

The FNAA (Local) policy defines "distribution" as the "circulation of more than ten copies of material from a source other than the District."  (Docket Entry No. 20, Ex. C). Under the FNAA (Local) Policy, if a student wants to distribute more than ten copies of nonschool material, it must be submitted to the principal or her designee for prior review. (*Id.*).  The principal or her designee must approve or reject the material within two school days.  (*Id.*).  Decisions made by the principal, superintendent, or designee may be appealed under the FNG (Local) policy which is the general student complaint process, and includes an appeal to the school board.  (Docket Entry No. 21, Ex. F).

The principal may reject submitted material only if it falls under one of the seven categories of speech set out in the "Limitations on Content" section of the FNAA (Local) policy.  This section states that students may not distribute materials that: are "obscene, vulgar, or otherwise inappropriate for the age and maturity of the audience"; "endorse actions endangering the health or safety of students"; would "violate the intellectual property rights, privacy rights, or other rights of another person"; "contain defamatory statements about public figures or others"; advocate imminent lawless or disruptive action and are likely to incite or produce such action"; "are hate literature or similar publications that scurrilously attack ethnic, religious, or racial groups or contain content aimed at creating hostility and violence"; "would  materially and substantially interfere with school activities or the rights of others"; or present "reasonable cause to believe that distribution of the nonschool literature would result in material and substantial interference with school activities or the rights of

others." (Docket Entry No. 20, Ex. C). The plaintiffs do not challenge the "Limitations on Content" part of the FNAA (Local) policy.

The FNAA (Local) policy states that each school's principal "shall designate times, locations, and means by which nonschool literature that is appropriate for distribution, as provided in this policy, may be made available or distributed by students to students or others at the principal's campus." (Docket Entry No. 20, Ex. C). For district facilities other than school campuses, the superintendent or her designee must designate the times, locations, and means for students to "distribute" ten or more copies of nonschool literature. The FNAA (Local) policy does not provide guidance on setting these time, place, and means restrictions. (Docket Entry No. 20, Ex. C).

The issues now before this court are narrow. The policy only applies to distribution on school campuses of nonschool material by students, not by outsiders or by teachers. The policy only applies to distribution on school campuses and district property; the policy does not govern what, how, or when students say, write, or distribute material to each other or to others at any location outside school district buildings and grounds. The plaintiffs are not challenging the Limitations on Content policy provisions, stating that these are "mostly permissible narrow limitations on the content of student speech." (Docket Entry No. 22, p. 1 n.1). Nor are the plaintiffs challenging the provisions governing how long a principal may take to decide whether to permit nonschool materials to be distributed or how a student may appeal the principal's decision. The plaintiffs are limiting their facial challenge to two aspects of the FNAA (Local) policy.

The first aspect the plaintiffs challenge is that the prior-review requirement only applies to the distribution of more than ten copies of nonschool material. The plaintiffs argue that this number is inherently arbitrary and unrelated to any showing of disruption. The second challenged aspect is the absence of specific criteria for setting time, place, and means limits on student distribution of ten or more copies of nonschool materials.

The plaintiffs argue that these aspects of the FNAA (Local) policy are facially unconstitutional under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). Under *Tinker*, suppression of student speech is prohibited unless school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school." *Id*. at 513. The plaintiffs argue no objective evidence of material and substantial disruption of school operations justifies the two challenged aspects of the FNAA (Local) policy. The defendants respond that *Tinker* is not the correct standard because the aspects of the FNAA (Local) policy that the plaintiffs challenge are viewpoint- and content-neutral. KISD argues that the appropriate standard is found in *United States v. O'Brien*, 391 U.S. 367 (1968). This standard allows restrictions on student speech that further an important or substantial government interest unrelated to the suppression of student expression, if the restrictions are no greater than necessary to facilitate that interest.

The arguments and responses are examined below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The movant

bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986)).

If the burden of proof lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports the essential element or claim. *Celotex*, 477 U.S. at 330. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by

"some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## III.    The Legal Standard for Reviewing Limits on Student Speech

### A.    Overview

The parties have thoroughly discussed the Supreme Court and lower-court case law on the different issues raised by student distribution of nonschool literature and materials on school premises.  The Supreme Court has generally cautioned that public school students' First Amendment rights must be construed "in light of the special characteristics of the school environment" and that the federal judiciary should not "intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."  *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).  The Supreme Court recently summarized the development of its case law on students' First Amendment rights. *Morse v. Frederick*, 127 S.Ct. 2618 (2007), involved student discipline for speech, not prior

11

restrictions on permissible student speech, but the Court's summary of the general principles is of broader application:

> Our cases make clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  At the same time, we have held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," and that the rights of students "must be 'applied in light of the special characteristics of the school environment.'"

*Id.* at 2622 (internal citations omitted).

The *Morse* Court began its analysis with *Tinker*, a First Amendment challenge filed by high school students suspended for protesting the Vietnam War by wearing black armbands to school.  The school officials had adopted a policy prohibiting students from wearing armbands and suspended those who nonetheless did so.  The *Tinker* Court found a First Amendment violation because the school officials had suppressed the students' protected speech without a basis to conclude that it would "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513.  The *Morse* Court emphasized that the facts in *Tinker* were "quite stark," as the high school students were engaging in political speech at the "'core of what the First Amendment is designed to protect.'"  127 S.Ct. at 2626 (quoting *Virginia v. Black*, 538 U.S. 343, 365 (2003)).

The next student speech case the Court examined in *Morse* was *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986).  *Fraser* was also a student-discipline case.  In *Fraser*, a high school student was suspended for giving a speech in an assembly that included a graphic sexual metaphor.  The Court upheld the suspension.  The *Morse* Court distilled two

12

basic principles from *Fraser*:  that First Amendment rights of students in public schools are "circumscribed 'in light of the special characteristics of the school environment,'" and that justifying limits on those rights does not always require the "substantial disruption" analysis prescribed in *Tinker*.  *Morse*, 127 S.Ct. at 2626-27 (internal citations omitted).

The final case analyzed in *Morse* was *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988).  In that case, staff members of a high school newspaper sued when their school decided not to publish two student articles.  The Supreme Court rejected the *Tinker* analysis, which the lower court had applied in invalidating the school's decision, because there was no evidence that publishing the articles would materially disrupt classwork or school discipline.  Instead, the Court held that because the newspaper articles were school-sponsored speech likely to be perceived as bearing the "imprimatur of the school" itself, the school officials did not violate the First Amendment by "exercising editorial control over the style and content . . . so long as their actions are reasonably related to legitimate pedagogical concerns."  *Morse*, 127 S.Ct. at 2627, quoting *Hazelwood*, 484 U.S. at 273.  In *Morse*, the Court emphasized that *Hazelwood*, like *Fraser*, confirmed that the "rule of *Tinker* is not the only basis for restricting student speech."  127 S.Ct. at 2627.

*Morse* itself recognized an additional basis for restricting student speech.  The Court held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use."  *Id.* at 2622.  The Court upheld

the suspension of a high school student who, at a school-sponsored event, displayed a large banner with a message reasonably understood to promote drug use.[4]

A facial challenge to a law is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 746 (1987).   Although courts generally will pass on facial challenges, there is an exception for First Amendment challenges based on overbreadth.  *See Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38 (1999).   Courts consider this doctrine a last resort and apply it only when "the law may have a chilling effect on the free speech rights of those not before the court."   *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000) (citing *United Reporting Publ'g Corp.*, 528 U.S. at 38-39).   A facial challenge fails when there is no "realistic danger" that the law will "significantly compromise recognized First Amendment protections of parties not before the Court."   *See Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

## B.     The Standard that Applies

---

[4]  In *Morse*, a student was suspended from school for waving a "Bong Hits 4 Jesus" banner at an off-campus, school-approved event.  127 S.Ct. 2618.  The principal interpreted the banner as promoting illegal drug use and told the student to take the banner down.  All the students holding the banner complied except Frederick, who was soon after suspended from the school.  The Court upheld the student's suspension because "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use."  *Id.* at 2622.  "It was reasonable for her [the principal] to conclude that the banner promoted illegal drug use - in violation of established school policy - and that failing to act would send a powerful message to the students in her charge, including Frederick, about how serious the school was about the dangers of illegal drug use.  The First Amendment does not require schools to tolerate at school events student expression that contributes to those dangers."  *Id.* at 2629.

The parties dispute the standard that applies to determine the facial validity of the FNAA (Local) policy. The plaintiffs urge that *Tinker* applies and requires KISD to justify the FNAA (Local) policy by showing objective evidence of an impending material and substantial disruption of school operations from students distributing nonschool materials on school property. The defendants urge that *Tinker* does not apply because the policy does not regulate student speech based on the viewpoint expressed. Instead, KISD argues that the *O'Brien* test applies. This test does not require a showing of substantial disruption but instead looks to whether the regulation is reasonable and narrowly tailored to serve a significant governmental interest (although not necessarily the least intrusive alternative available).

The plaintiffs argue that there are three categories of speech regulation, which do not overlap. Those categories are: (1) vulgar, lewd, and obscene speech (governed by *Fraser*); (2) school-sponsored speech (governed by *Hazelwood*); and (3) speech that falls into neither of those two categories (governed by *Tinker*). (Docket Entry No. 22, p. 12). Because the FNAA (Local) policy provisions at issue here may apply to speech that is not covered by *Fraser* or *Hazelwood*, the plaintiffs argue that *Tinker* governs. There are courts that have followed this approach. *See Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 212-214 (3d Cir. 2001); *DePinto v. Bayonne Bd. of Educ.*, Civil Action No. 06-5765 (JAG), 2007 WL 2726534, at *4 (D.N.J. Sept. 17, 2007). The defendants argue that the Fifth Circuit's approach is less rigid. In *Canady v. Bossier*, 240 F.3d 437, 441-44 (5th Cir. 2001), the Fifth Circuit analyzed the first three of the four student-speech Supreme Court cases and its own

First Amendment school jurisprudence in resolving a challenge to a school dress code.  The court identified four categories of student speech regulations, each reviewed under a different standard.  The categories were: (1) school regulations directed at specific viewpoints; (2) school regulations governing student expression involving lewd, vulgar, obscene, or offensive speech; (3) school regulations governing student speech related to school-sponsored activities; and (4) school regulations that are viewpoint-neutral and fall into none of the previous three categories.  *Canady*, 240 F.3d at 442.

The first category, school regulations directed at speech because that speech has a specific viewpoint, is governed by a *Tinker* analysis.  The second category is regulation of student speech that is lewd, vulgar, or obscene.  This was the type of speech at issue in *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986).  The Court in *Fraser* distinguished the student's "offensively lewd and indecent speech" at issue in that case from the "nondisruptive, passive expression of a political viewpoint in *Tinker*" and held that the *Tinker* substantial-disruption test did not apply.  *Id.* at 677-79.

The third category discussed in *Canady* is regulation of school-sponsored student speech.  This was the category involved in *Hazelwood*, which also held that the *Tinker* "substantial disruption" test did not apply.  484 U.S. at 270-73.  The Court in *Hazelwood* held that if the forum is not public, school officials may regulate school-sponsored speech so long as "their actions are reasonably related to legitimate pedagogical concerns."  *Id.* at 273.  No showing of substantial disruption is required.  *Id.*

16

The fourth category recognized in *Canady* is student speech regulation that is viewpoint-neutral and does not fall into any of the other three categories. *Canady* held that such viewpoint-neutral regulations are not evaluated under *Tinker* but under either the *O'Brien* test for expressive conduct or the traditional time, place, and manner analysis, which imposes "virtually the same standards of scrutiny." *Id.* at 443. According to the *Canady* court, this fourth category was warranted because "[a]pplying the *Tinker* analysis to all other restrictions on student speech does not account for regulations that are completely viewpoint-neutral." *Id.* *Canady* itself involved a challenge to a mandatory school uniform policy; the court found that the uniform policy was appropriately analyzed as a viewpoint-neutral regulation. *Id.* Applying the *O'Brien* test, the court upheld the policy because it served an important or substantial government interest unrelated to the suppression of student expression and the incidental restrictions on First Amendment activities were no more than was necessary to facilitate that interest. *Id.* at 443-44.

In *Littlefield v. Forney Independent School District*, the Fifth Circuit reaffirmed its holding in *Canady* that *O'Brien* was the appropriate framework for analyzing viewpoint- and content-neutral restrictions on expressive student conduct. 268 F.3d 275, 285-86 (2001). Applying the *O'Brien* test, the court again upheld a school uniform policy against a First Amendment challenge. *Id* at 282-86. The Fifth Circuit also employed the four-category approach to student-speech cases in *Porter v. Ascension Parish School Board*, in which the court held that a student's drawing of his school under attack was protected speech under the First Amendment. 393 F.3d 608, 614-15 (2004).

The Fifth Circuit's approach in *Canady, Littlefield,* and *Porter*, has followed that of a number of courts in deciding whether *Tinker* applies.  Under this approach, *Tinker* is the default rule that applies to suppression of student speech based on its viewpoint.  Student speech cannot be banned because of the viewpoint expressed unless the school presents facts that could reasonably lead it to "forecast substantial disruption of . . . school activities." *Tinker*, 393 U.S. at 514.  This rule does not apply, however, when schools regulate speech for reasons unrelated to its viewpoint.  The *Tinker* rule also does not apply to speech that is or may reasonably be viewed as school-sponsored.[5]

The FNAA (Local) policy provisions that the plaintiffs challenge are both content- and viewpoint-neutral.  The prior-review provision applies to student distributions of more than

---

[5] *See also Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 542-43 (6th Cir.2001) (holding that the suspension of students for wearing T-shirts depicting the confederate flag was a content-based restriction of student speech that must satisfy the *Tinker* standard, but that a different standard would apply if the speech could have been viewed as school-sponsored); *Henerey v. City of St. Charles*, 200 F.3d 1128, 1132-33 (8th Cir. 1999) (declining to apply *Tinker* because campaign activities by a candidate for student council is school-sponsored speech); *Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918, 923-34 (10th Cir.2002) (holding that a tile painting and installation project established by the school district is school-sponsored speech, and as a result declining to apply *Tinker)*; *Bannon v. Sch. Dist. of Palm Beach County*, 387 F.3d 1208, 1214-15 (11th Cir.2004) (declining to apply *Tinker* because murals painted as part of a construction beautification project is school-sponsored speech).

The Seventh Circuit has followed a slightly different approach.  In *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530 (7th Cir.1996), the Seventh Circuit considered whether the First Amendment allows a school to ban a student from distributing invitations to a religious gathering.  The court emphasized *Hazelwood*'s "initial determination of the type of forum at issue" and held that absent a public forum, the *Hazelwood* test ("reasonably related to legitimate pedagogical concerns") applies to regulations on student speech.  *Id.* at 1537-38.  The court focused only on the distinction between public and nonpublic forums and held that all student speech regulation in a nonpublic forum is governed by the *Hazelwood* test, regardless of whether the speech was (or could be seen as) school-sponsored.  *Id.* Applying its interpretation, the majority found that the school was not a public forum and that the administrators' actions met the *Hazelwood* test.  *Id.* at 1539-43.  The Ninth Circuit has also measured school regulation of speech using the standard of whether the regulation was reasonable based on pedagogical interests, even if the regulation did not involve school-sponsored speech.  *See Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166 (9th Cir. 2006), *vacated as moot*, 127 S.Ct. 1484 (2007).  Although this case is moot, it may be considered for its persuasive authority.  *See Christianson v. Colt Inds. Operating Corp.*, 870 F.2d 1292, 1298-99 (7th Cir.), *cert. denied*, 493 U.S. 822 (1989)).

ten copies of "nonschool literature" on school campuses or district property.  (Docket Entry No. 20, Ex. C).  The time, place, and means limitation provision applies to material found appropriate for distribution under criteria that are not challenged.  Under *Canady, Tinker* does not apply because the FNAA (Local) policy provisions at issue are viewpoint-neutral.  By contrast, in *Hall v. Board of School Com'rs of Mobile County, Alabama,* 681 F.2d 965 (5th Cir. 1982), the court applied *Tinker* and struck down a school policy regulating the distribution of literature on school campuses.  The policy stated that "all material political or sectarian in nature distributed on any school campus shall have prior approval of the Assistant Superintendent of Administration." *Id.* at 967.  Another provision stated that the "distribution of special interest materials in the local school shall have prior approval . . . ." *Id.*  Because the policies were directed at  particular content  (political, sectarian, or "special interest"), the court applied *Tinker* and not *O'Brien.  Id.* at 971-72.  The FNAA (Local) policy at issue here, however, is not targeted at certain nonschool material based on its content or viewpoint.  The first category of speech regulation recognized in *Canady* – to which *Tinker* applies – is not present.

The second and third categories recognized in *Canady* are similarly inapplicable.  The FNAA (Local) policy does not involve only "lewd" student speech (which is governed by *Bethel School District v. Fraser*, 478 U.S. 675 (1986)) or school-sponsored speech (which is governed by *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)).  The fourth category recognized in *Canady*—a viewpoint-neutral regulation that does not fall into the first three

19

categories—is present here.  *Tinker* does not apply to such a regulation.  *See Canady*, 240 F.3d at 441-44; *Littlefield*, 268 F.3d at 285-86; *Porter*, 393 F.3d at 614-15.

The decision that *Tinker* does not apply is consistent with the analysis in *Morgan v. Plano Independent School District*, 2007 WL 397494 (E.D. Tex. Feb. 1, 2007).  That case considered a policy similar to the FNAA (Local) policy at issue here.  *Id.* at *4 n. 3.  The court concluded that the *Tinker* substantial-disruption test did not apply because the school regulation was viewpoint-neutral.  *Id.* at *8.  "The Fifth Circuit [in *Canady*] specifically found *Tinker* was applicable to school regulations directed at student viewpoints, and *Tinker* does not account for regulations that are completely viewpoint-neutral.  The present case presents just such a situation where the regulations are viewpoint-neutral. . . . As a result, *Tinker* is not the standard to be applied in this case for determining the facial constitutionality of the 2005 Policies."  *Id.*

The plaintiffs argue that *Tinker* applies to this facial challenge because literature and other material is "pure speech," while *Canady* and *Littlefield* involved dress codes.  (Docket Entry No. 22, pp. 5-7).  The plaintiffs assert that such codes regulate "noncommunicative conduct"—what people wear—rather than "pure speech."  This distinction does not make the difference the plaintiffs assert.  *Tinker* itself involved a challenge to what students wore (black armbands).  As *Tinker* recognized, clothing can strike at "core" First Amendment values of political speech.  The First Amendment does not only protect "verbal and written expression, but also symbols and conduct that constitute 'symbolic speech.'"  *Littlefield*, 268

F.3d at 282 (citing *Tinker*, 393 U.S. at 505-06).[6]  Indeed, some of the student-distributed

materials that gave rise to this case are not "pure speech" but include items such as the faith

bracelets handed out by one child.  To determine whether particular materials or conduct

possess "sufficient communicative elements" to implicate First Amendment protection,

courts ask whether "[a]n intent to convey a particularized message was present, and . . .

[whether] the likelihood was great that the message would be understood by those who

viewed it." *Spence v. Washington*, 418 U.S. 405, 410-11 (1974).  Although the *O'Brien* test

itself applies to "expressive conduct," such as burning draft cards or wearing particular

clothing, the *Canady* court noted that the test applies the same standard as the time, place,

and manner analysis.  *Canady*, 240 F.3d at 443.  Under the "reasonable time, place and

manner restrictions" standard,  a regulation will be held constitutional if it is content-neutral,

narrowly  tailored  to  serve  a  significant  government  interest,  and  leaves  open  ample

alternative channels of communication.  *See Perry Educ. Ass'n v. Perry Local Educator's*

*Ass'n,* 460 U.S. 37, 45 (1983) (applying the time, place, and manner standard); *Hill v.*

*Colorado,* 530 U.S. 703, 704 (2000) (applying time, place, and manner analysis to law

limiting the distribution of handbills).  The time-place-manner analysis can apply to written

speech as well as expressive conduct.  *See Clark v. Cmty. for Creative Nonviolence*, 468 U.S.

288, 299 n.8 (1994) ("Reasonable time, place, or manner restrictions are valid even though

---

[6]  "While we have rejected the view that an apparently limitless variety of conduct can be labeled
speech whenever the person engaging in the conduct intends thereby to express an idea, we have
acknowledged that conduct may be sufficiently imbued with elements of communication to fall within the
scope of the First and Fourteenth Amendments." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citations and
internal quotations omitted).

they directly limit oral or written expression."); *U.S. v. Costner*, 68 F.3d 218, 221 ("Written expression in a public park is subject to reasonable time, place or manner restrictions."); *Morgan*, 2007 WL 397494, at *8 (applying time, place, and manner analysis to regulation limiting distribution of written materials in schools).

The plaintiffs also argue that, even if after *Canady,* the *Tinker* standard does not apply to viewpoint-neutral regulations, *Tinker* does continue to apply to regulations that discriminate on the basis of content. (Docket Entry No. 22, p. 8). Content and viewpoint discrimination are closely related; the distinction is "not a precise one." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 831 (1995).[7] The Supreme Court has stated that "discrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination." *Rosenberger*, 515 U.S. at 830-31. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Id.* at 829

---

[7] Government regulation is content-neutral if it is "justified without reference to the content of the regulated speech." *Ward, et al. v. Rock Against Racism*, 491 U.S. 781 (1989); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Perry Ed. Assn. v Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983)). In *R.A.V. v. St. Paul*, 505 U.S. 377 (1992), the Court struck down an ordinance that prohibited the display of a symbol that "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *Id.* at 377. The Court declared the ordinance facially unconstitutional because it "prohibits otherwise permitted speech solely on the basis of the subjects the speech addresses." *Id.* at 381. The Court held that the city could proscribe fighting words, but it could not proscribe fighting words directed against others on the basis of "race, color, creed, religion or gender." The city discriminated based on content when it proscribed fighting words directed at others based on those categories. "[The city] has proscribed fighting words of whatever manner that communicate messages of racial, gender, or religious intolerance. Selectivity of this sort creates the possibility that the city is seeking to handicap the expression of particular ideas." *Id.* at 393-94. While the city could proscribe libel, it could not "make the further content discrimination of proscribing only libel critical of the government." *Id.* at 384.

(citation omitted).  The different standard that results from the presence of viewpoint rather than content discrimination is that "content discrimination . . . may be permissible if it preserves the purposes of that limited forum," while "viewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 830 (citing *Perry*, 460 U.S. at 46).  Because viewpoint-based regulation is a subset of content-based regulation, KISD's argument does not misread *Canady,* as the plaintiffs argue.[8]

The FNAA (Local) policy provisions that the plaintiffs challenge are both viewpoint- and content-neutral regulation of student speech on school campuses and district property. (The plaintiffs do not challenge the "Limitations on Content" provisions.)  Under *Canady*, the facial challenges to the "more than ten" trigger for the prior-review requirement and the absence of specifics in the "time, place, and means" provision are properly analyzed under *O'Brien* and the time-place-manner analysis, not the *Tinker* substantial-disruption standard. The policy provisions at issue will survive scrutiny if: (1) they are within the constitutional power of the KISD; (2) they further an important or substantial governmental interest; (3) the asserted government interest is unrelated to the suppression of student expression; and (4)

---

[8]  The plaintiffs point to *Chiu v. Plano Independent School District,* 339 F.3d 273 (5th Cir. 2003) (*Chiu II*) to argue that in the Fifth Circuit, *Tinker* continues to apply to content-based as well as viewpoint-based regulations on school speech.  *Chiu II* dealt with parents challenging the school district's prohibition on the distribution of flyers and the circulation of a petition objecting to a change in the math curriculum at the public school.  The court found that there was a genuine issue as to whether the school officials engaged in viewpoint discrimination.  *Id.* at 282-83.  The court applied the *Tinker* analysis and found that the officials enforced the school prior-review policy on distribution of nonschool literature in an unconstitutional manner. *Id.* at 283.  *Chiu II* concerned a regulation applied so as to discriminate based on the speakers' viewpoint; it does not appear to support the plaintiffs' argument.

the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest.  *Id.*

   C.   **The Case Law on Prior-Review Requirements**

   The Supreme Court has not specifically addressed the limits on school regulations that require review of nonschool materials before permitting their distribution at school.  Some lower courts have found that even when *Tinker* applies, the language in the opinion allowing school officials to prohibit speech when they can reasonably forecast a substantial disruption allows for some prior review.  *See, e.g., Bystrom ex rel. Bystrom v. Fridley High School, Indep. Sch. Dist. No. 14*, 822 F.2d 747, 755 (8th Cir. 1987) (policy banning distribution of unofficial written material that "presents a clear and present likelihood that, either because of its content or the manner of distribution, it will cause a material and substantial disruption of the proper and orderly operation and discipline of the school or school activities" did not violate students' First Amendment rights); *Quarterman v. Byrd*, 453 F.2d 54 (4th Cir. 1971) (high school may prevent distribution of publications when school can reasonably forecast disruption); *Eisner v. Stamford Bd. of Educ.*, 440 F.2d 803 (2d Cir. 1971) (upholding requirement of prior submission of publications if accompanied by procedural safeguards when the school officials can forecast a resulting substantial disruption of school activities); *Heinkel ex rel. Heinkel v. School Bd. of Lee County, Fla.*, 2005 WL 1571077 (M.D. Fla. 2005), *aff'd in part, rev'd in part and remanded*, 194 Fed. Appx. 604 (11th Cir. 2006) (upholding school's restriction on student distribution of literature addressing alternatives to abortion because such distribution of the material was not part of the curriculum and, given

the divisive nature of the topic, the school could reasonably assume that distribution would create a material and substantial disruption in school activities).  Other courts applying *Tinker* have struck down prior-submission requirements.  *See, e.g., Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273 (5th Cir. 2003), *cert. dismissed*, 124 S. Ct. 871 (U.S. 2003) (school district policy requiring students, parents, and community members to submit nonschool material for approval by school officials before distribution on school property was unconstitutional prior restraint of parents' rights when they sought to distribute materials on a new math curriculum after a public informational meeting); *Shanley v. Ne. Indep. Sch. Dist., Bexar County, Tex.*, 462 F.2d 960 (5th Cir. 1972) (when distribution was orderly and no disruption actually occurred or was reasonably foreseeable under the circumstances, school's policy prohibiting such distribution without prior approval was unconstitutional as applied).

Lower courts have also upheld school policies requiring prior review without a *Tinker* substantial-disruption showing, if the policies set out specific and permissible criteria for deciding whether to permit distribution, a specific and short time limit within which the decision is to be made, and procedures to take if permission is denied.  *See, e.g., Sullivan v. Houston Indep. Sch. Dist.*, 475 F.2d 1071, 1073 (5th Cir. 1973) (school rule requiring prior submission of all nonschool-sponsored publications did not violate the Constitution when the rule allowed officials to prohibit publications containing "libelous or obscene language or advocat[ing] illegal action or disobedience" but did not allow officials to prohibit publications because they "contained the expression of any idea, popular or unpopular")

25

(internal quotations omitted); *Nelson v. Moline Sch. Dist. No. 40*, 725 F. Supp. 965 (C.D. Ill. 1989) (school policy permitting distribution of nonschool materials that were first approved by the principal was a reasonable time, place, and manner restriction that did not violate the First Amendment when the policy gave specific guidelines for review and provided that the decision had to be reached within two hours of request).   The Seventh Circuit has upheld prior-review requirements as consistent with the general rule that "prior restraint of student speech in a nonpublic forum is constitutional if reasonable" and is an "important tool in preserving a proper educational environment." *Muller ex. rel. Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530 (7th Cir. 1996), *cert. denied*, 520 U.S. 1156 (1997) (approving restrictions on student expression as "reasonably related to legitimate pedagogical concerns.").

The FNAA (Local) policy at issue here has many of the features that courts have found necessary for facial constitutionality.[9]   The policy significantly limits a principal's discretion in rejecting materials submitted for review.   The policy limits the time a principal may take to approve or reject materials.   The policy provides an opportunity to appeal.   As

---

[9] *See, e.g., Burch v. Barker*, 861 F.2d 1149, 1158-59 (9th Cir. 1988) ("blanket policy of unlimited scope and duration" that required that all written materials to be distributed on school premises and which were neither school supported nor endorsed be submitted for "prior school review for censorship purposes" was unconstitutional, although court did not "decide under what more limited circumstances, if any, a school may impose a policy of predistribution review"); *Shanley v. Northeast Indep. School Dist., Bexar County, Tex.*, 462 F.2d 960 (5th Cir. 1972) (prior review policy was unconstitutional as denial of procedural due process because it contained no provision for timely administrative appeal and no standards for the principal's decision); *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp.2d 98 (D. Mass. 2003) (policy requiring approval of an administrator to distribute literature unrelated to the curriculum struck down as policy had no time limitations for approval or denial and no clear definitions of "responsible speech," leaving the choice to restrain the speech to an administrator without guidelines, leading to arbitrary decisions); *Slotterback ex rel. Slotterback v. Interboro School Dist.*, 766 F. Supp. 280 (E.D. Pa. 1991) (school policy requiring submission to principal for approval prior to distribution was unconstitutional prior restraint where policy had no time limits or procedural safeguards).

noted, the plaintiffs challenge only two aspects of the FNAA (Local) policy.  The first is that the prior-review requirement and the time, place, and manner restrictions apply only when a student wants to "distribute" nonschool materials.  "Distribution" is defined to mean the "circulation of more than ten copies of material from a source other than the District."  The plaintiffs challenge "more than ten" as arbitrary.  The second aspect is that the policy does not provide sufficient guidance to principals charged with setting time, place, and manner limits for their school.  Each challenge is addressed below.

**IV.    The Challenge to the "More than Ten" Provision**

According to the plaintiffs, the more-than-ten provision makes the policy simultaneously over- and underinclusive.  For example, the policy would require a principal to review in advance a Dr. Seuss book if a student wanted to hand out eleven copies but would not require prior review if a student wanted to hand out nine copies of a sexually explicit magazine.

Few cases analyze a numerical "trigger" to a prior-review requirement.  Several cases approve prior-submission requirements and time, place, and manner limits that apply to student distribution of nonschool materials, regardless of the number of copies involved.  *See Sullivan v. Houston Indep. Sch. Dist.*, 475 F.2d 1071, 1075-77 (5th Cir. 1973); *Bystrom ex rel. Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 750 (8th Cir. 1987); *Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1129, 1134-36 (8th Cir. 1999); *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1540-41 (7th Cir. 1996); *Morgan*, 2007 WL 397494 and 654308 (E.D. Tex. Feb. 1, 2007).  One case approves as

facially constitutional a prior-submission requirement for students seeking to distribute "more than 10 copies of the same written material on one or more days in the school or school grounds." *Hedges v. Wauconda Community Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1296 (7th Cir. 1993). In this case, however, the Seventh Circuit did not directly address the numerical provision precluding students from distributing more than ten copies of written material primarily prepared by nonstudents. The court did state that a school had the prerogative to decide that it was consistent with the school's educational mission to require students who wanted to make a general circulation to use their own words, while allowing students content to pass out ten or fewer copies to avoid "the labor of exposition." *Id.* at 1302. The court applied forum analysis and, recognizing that the public middle school was a nonpublic forum, affirmed the provision as neither arbitrary nor unreasonable. *Id.*

KISD correctly notes that by limiting the prior-review requirement and the time, place, and manner limits to distributions of more than ten copies, the FNAA (Local) policy is less restrictive than if it applied to all nonschool materials handed out by students. Subjecting only the distribution of more than ten copies of nonschool material to the prior-review requirement and time, place, and manner restrictions is a viewpoint- and content-neutral regulation. The quantity of nonschool materials distributed has no relationship to the viewpoint or content of the materials. Under the Fifth Circuit's decision in *Canady*, viewpoint- and content-neutral regulations of student speech in public schools are analyzed under either *O'Brie*n or the time, place, and manner standard. 240 F.3d at 442.

KISD has submitted a declaration by Bonnie Holland, Assistant Superintendent for Governance, Legal Affairs, and Special Programs, explaining the purpose of the FNAA (Local) policy provision.  In the declaration, Holland stated that the policy's purpose is:

> [T]o help reduce the inevitable disruption caused by the distribution of any nonschool literature, regardless of its content or viewpoint, in order to protect the public school system's goal of educating its students, and to allow the principal to ensure that certain categories of unprotected speech (such as obscenity) are not widely distributed to students.

(Docket Entry No. 21, Ex. A, ¶ 4).  Holland further explained that the purpose of defining "distributions" as disseminations of more than ten copies of nonschool material was to preserve students' rights to engage in interpersonal communications at school, such as exchanging birthday cards or a copy of a Dr. Seuss book, while limiting the potential for more disruptive widespread disseminations.  *Id.* at ¶ 5.  Holland stated that the district relied on the recommendations of the Texas Association of School Boards (TASB) in setting this policy.[10]  (Docket Entry No. 21, Ex. A, ¶ 3,5, Exs. G, H).

The record shows that the FNAA (Local) policy provision at issue serves three major purposes.  First, imposing the prior-review requirement only on student distributions of more than ten copies of nonschool materials reduces the likelihood that unprotected speech, which administrators may wholly exclude from the school, will be widely disseminated before the administration learns about it and can stop it.  Second, limiting the application of the prior-

---

[10]KISD filed the transcript of the hearing held by the Plano ISD in enacting their revised policy imposing prior review and time, place, and manner restrictions on student distribution of nonschool material. This was the policy upheld in large part in the *Morgan* case.  The plaintiffs move to strike this transcript from the record because the KISD did not rely on it in enacting the FNAA (Local) policy at issue here.  This court does not rely on the transcript and therefore need not decide whether it is admissible.

review requirement to distributions of more than ten copies means that students can continue to exchange or pass out ten or fewer copies of nonschool materials without obtaining prior approval, reducing both the intrusion on student interactions and the burden on school administrators.  Third, limiting the application of time, place, and manner restrictions to student distributions of more than ten copies of materials reduces disruption to school activities that may result from widespread dissemination even of materials found appropriate for students to receive at school.  KISD has a substantial interest in limiting both the prior-review requirement and time, place, and manner restrictions to distributions of more than ten copies.

Subjecting only "distributions" to prior review does not mean that KISD permits students to hand out ten or fewer copies of nonschool material containing content that could be banned under the FNAA (Local) policy, such as a sexually explicit magazine.  Rather, it only means that such small-scale disseminations are not subject to prior review.  A school could stop students from circulating obscene materials or discipline students who did so, regardless of the number of copies actually handed out.  Debbie Barker, the principal of Pattison Elementary School, explained that "[e]ven where FNAA (Local) would not prohibit the distribution of materials by students, we still would apply both the *Tinker* 'material and substantial disruption' test and normal classroom rules."  (Docket Entry No. 21, Ex. I, ¶ 4). Whether a student hands out more or fewer than ten copies of nonschool material does not determine whether that material can be given to other students at school.  That is addressed by the Limitations on Content restrictions, which the plaintiffs do not include in their facial

30

challenge.  Restricting the prior-review requirement to distributions of ten or more copies means that administrators will not have to review every single note, letter, picture, or tape handed out by or exchanged among students, which would unnecessarily tax administrators' time and students' interactions.  Setting the prior-review cutoff at more than ten strikes a reasonable balance between conserving administrative resources and promoting normal student social interaction on the one hand and preventing unprotected materials from being broadly circulated on the other hand.  Requiring students who want to hand out more than ten copies to get prior permission and comply with time, place, or manner limits also reduces the distraction caused by students handing out multiple copies of nonschool material, regardless of content.

KISD concedes that picking any particular numerical cutoff is arbitrary to some extent, but that ten or more is a reasonable line.  It allows students to continue to exchange or hand out a small number of nonschool materials free of prior administrative approval, while allowing the school to minimize the risk of widespread distribution of unprotected material and to reduce the disruption caused by the widespread distribution of protected materials.  The incidental restrictions on First Amendment activities are no more than is necessary to facilitate the asserted government interest.[11]  KISD has chosen a numerical cutoff that strikes a balance between limiting disruptive speech on one hand and conserving administrative resources and allowing normal student social interactions on the other hand.

---

[11]  This last prong of the *O'Brien* standard is essentially the equivalent of the "narrowly tailored" requirement of the time, place, and manner standard.

While not explicitly considered by the *O'Brien* test,[12] the "ample alternative means" prong of the time, place, and manner standard is also satisfied.  Students can avoid the FNAA (Local) policy simply by disseminating ten or fewer copies.  Students can also express their ideas verbally to as many individuals as they want.  Students can also distribute as many copies of the material as they wish off school grounds.  The "more than ten" provision does not make the FNAA (Local) policy facially unconstitutional.

## V.    Time, Place, and Manner Limitations

The plaintiffs argue that the FNAA (Local) policy's delegating to the principal of each school the task of setting time, place, and manner regulations for students distributing approved nonschool material at that school is overbroad and therefore facially unconstitutional.  The plaintiffs argue that this provision grants "unfettered discretion [to the principal] to enact time, place and manner restrictions with no guidelines issued by a principal that would allow students to know when they may exercise their right to free speech and when they may not."  (Docket Entry No. 21, p. 3).

The FNAA (Local) states that "[e]ach campus principal shall designate times, locations, and means by which nonschool literature that is appropriate for distribution, as provided in this policy, may be made available or distributed by students to students or others at the principal's campus."  (Docket Entry No. 20, Ex. C).  The provision does not impose

---

[12]  The time, place, and manner standard differs from the *O'Brien* test in that the former requires a consideration of the alternative channels left open to the speaker. However, one scholar points out that, in applying *O'Brien*, courts adjust the burden placed on the government to demonstrate the existence of a substantial interest and the absence of less restrictive alternatives depending on the speaker's available alternative means of expression. *See* Geoffrey R. Stone, *Content Regulation and the First Amendment*, 25 *Wm. & Mary L. Rev.* 189, 191 (1983).

time, location, or means limits on student distribution of nonschool material.  Instead, the provision delegates to each principal the task of setting such limits at their school.  Such delegation is not itself a speech regulation; neither the *Tinker* nor *O'Brien* tests are applicable.

The provision delegating the task of setting time, place, and manner limits on student distribution of nonschool materials applies to all approved nonschool materials; it is not a content- or viewpoint-based regulation that would make *Tinker* apply.  Courts have applied *O'Brien* to policies that specify the time, place, and manner limits on student speech, but not to policies that merely delegate authority to establish such limits.  *See, e.g., Canady v. Bossier*, 240 F.3d 437, 441-44 (5th Cir. 2001) (applying the *O'Brien* test to a school board uniform policy mandating specific types of clothing); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275 (5th. Cir. 2001) (same); *Morgan v. Plano Indep. Sch. Dist.,* 2007 WL 397494 (E.D. Tex. Feb. 1, 2007) (applying the *O'Brien* test to a school board speech policy imposing specific time and area limitations for the distribution of materials).

The plaintiffs argue that the FNAA (Local) policy provides "no *Shanley* guidelines governing how a principal should implement this section of the policy."  (Docket Entry No. 20 at 16).  In *Shanley*, the Fifth Circuit applied *Tinker* in finding unconstitutional the suspension of five students who violated a school policy by distributing an "underground" newspaper without submitting it to the principal for prior review.  462 F.2d 960.  The court held that the school policy was both overbroad and vague because it contained no clear

standards for the principal to follow in approving and rejecting student materials.  The policy

stated, in pertinent part:

> Be it further resolved that any attempt to avoid the school's
> established procedure for administrative approval of activities
> such as the production for distribution and/or distribution of
> petitions or printed documents of any kind, sort, or type without
> the specific approval of the principal shall be cause for
> suspension, and if in the judgment of the principal, there is
> justification, for referral to the office of the Superintendent with
> a recommendation for expulsion . . . . *Id.* at 964-65.

After striking down the policy, the court identified guidelines that schools should follow in

developing prior restraint policies.  "The thrust of the 'policy' in question must include

guidelines stating clear and demonstrable criteria that school administrators should utilize

to evaluate materials submitted to them for prior clearance and distribution."  *Id.* at 977.

These regulations must: (1) state clearly the means by which students are to submit proposed

materials to the principal or school administration; (2) state a brief and reasonable period of

time during which the principal or administration must make their decisions; (3) state clearly

a reasonable appellate mechanism and its methodology; and (4) state a brief and reasonable

time during which the appeal must be decided.  *Id.* at 978.  The policy in *Shanley* included

none of these guidelines.  In *Sullivan v. Houston Independent School District*, 475 F.2d 1071

(5th Cir. 1973), decided the following year, the court emphasized that the school district had

revised the policy in light of *Shanley*, to provide the criteria necessary to guide a school

official in deciding whether to allow materials to be distributed; to define when and how

material had to be submitted for review; to limit the time a school official could have to

review the materials; and to provide an appellate process.  The court found that the school

policy was facially constitutional because it met the *Shanley* guidelines.  "[I]t cannot be seriously urged that this prior submission rule is unconstitutionally vague or overbroad." *Id.* at 1076.

Unlike the policy rejected in *Shanley* and like that upheld in *Sullivan,* the FNAA (Local) policy gives a principal clear guidelines to follow in deciding whether to approve or reject materials for distribution, limits the time for review, and provides an appeals process. The principal may only reject submitted materials that fall under one of the seven unprotected categories of speech listed in the "Limitations on Content" section of the policy and must decide in two days.  The policy allows the student to appeal.  The plaintiffs do not challenge these aspects of the KISD FNAA (Local) policy.  These aspects meet the criteria the Fifth Circuit identified in *Shanley* and approved in *Sullivan*.

The school-speech policy at issue in *Shanley* and *Sullivan* is different from the policy provision the plaintiffs challenge here.  The "unfettered" discretion that the plaintiffs find offensive is the discretion to set a general time, place, and manner policy for students distributing approved nonschool material on a school campus.  There is a significant difference between discretion to accept or reject particular items of material for distribution and discretion to formulate a general set of time, place, and manner limits on distribution. *Shanley* speaks to the former. The plaintiffs challenge only the latter.

Granting a principal discretion to set general time, place, and manner regulations that apply to nonschool material found "appropriate for distribution" under specific criteria that are not challenged is different from giving a principal broad discretion to approve or reject

material for distribution.  The Supreme Court has articulated the problem with the second kind of discretion in another context, stating: "Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content."  *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).  This problem is addressed by limiting an official's discretion to decide what materials will be approved.  A policy that delegates discretion to set content- and viewpoint-neutral time, place, and manner regulations, applicable to all materials approved for distribution, does not present an opportunity for different treatment based on the material's content or viewpoint.  The KISD policy provision authorizing principals to set a time, place, and manner policy for students distributing nonschool materials on their campuses does not grant the principals discretion to treat materials differently depending on content or viewpoint.

KISD could have set more specific time, place, and manner regulations in the district-wide FNAA (Local) policy, rather than delegating the task of setting such regulations to the principals at each school.  For example, the policy reviewed in *Morgan* contained different time, place, and manner limitations for elementary campuses on the one hand and middle and secondary campuses on the other hand.  But the policy in *Morgan* also stated that "[c]ampus principals may develop other reasonable time, place, and manner restrictions regarding the distribution of materials."  2007 WL 397494, at *4 n. 3.  The *Morgan* court did not find the policy unconstitutional because it included a broad delegation of authority to the school principals.  *Id.* at *8; *see also Muller*, 98 F.3d at 1543 (approving policy requiring student

and principal to cooperatively determinate the appropriate time and place for distribution).
The plaintiffs have not cited cases that invalidate a student-speech regulation because it
authorized the establishment of time, place, and manner restrictions at a particular facility but
did not provide detailed guidance or criteria for what specific restrictions would be
reasonable for that facility.  The FNAA (Local) policy provision stating that principals are
to create time, place, and means restrictions for their campuses is not itself a time, place, and
manner regulation.  The Constitution does not require the KISD to enact a district-wide set
of time, place, and manner limits on student distribution of nonschool materials, as opposed
to having principals do so for their particular campuses.

To authorize a principal to set time, place, and manner limitations for student
distribution of nonschool materials at a particular campus does not give that principal
"unfettered" discretion, so as to result in a finding of facial unconstitutionality.  Limiting the
principal's discretion to setting only time, place, and manner restrictions is itself a "fetter"
on discretion.  The principal does not have discretion to prohibit or limit the distribution of
nonschool material based on its content or viewpoint.  To the contrary, the only restrictions
a principal has discretion to put into place at her school are restrictions on *when* materials
approved for student distribution can be distributed, *where* on the campus they can be
distributed, and *how* they can be distributed.

The discretion to set time, place, and manner regulations could be exercised in an
unconstitutional manner.  A principal may set unreasonable restrictions on the time, place,
or manner for students distributing nonschool materials, taking into account such

37

circumstances as whether the restrictions apply to an elementary, middle, or upper school, and the physical layout of that school.  Whether specific time, place, and manner restrictions adopted at a particular KISD campus or applied to a particular student distribution of nonschool material is unconstitutional is not presently before this court.[13]  The plaintiffs may challenge the time, place, and manner restrictions put into place on particular campuses and may challenge whether any principal has applied time, place, and manner restrictions to particular students' distribution of nonschool material in the next stage of this case.  The plaintiffs' challenge to the FNAA (Local) policy as facially unconstitutional fails.

## VI.    Conclusion and Order

This court grants the defendants' motion for partial summary judgment and denies the plaintiffs' cross-motion for partial summary judgment, finding that the FNAA (Local) policy is not facially unconstitutional.  The parties are to submit a proposed scheduling order to resolve the "as-applied" challenge to the FNAA (Local) policy no later than **October 5, 2007**.

SIGNED on September 24, 2007, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

---

[13] The scant record on this point shows that some KISD principals have adopted similar time, place, and manner regulations for their campuses.  Many KISD elementary schools allow their students to distribute nonschool materials before and after the instructional school day begins.  (Docket Entry No. 23, Ex. B at 91:5– 91:24 (Deposition of Bonnie Holland); Docket Entry No. 23, Ex. C at 26 (Deposition of Debbie Barker)).