**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BLAKE POUNDS, *et al.*, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-06-0527 |
| | § | |
| KATY INDEPENDENT SCHOOL | § | |
| DISTRICT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This case again requires analysis of the delicate balance that public school administrators must strike between protecting the First Amendment right to free speech and avoiding endorsing religion in violation of the Establishment Clause.  The many cases and the large body of literature on this set of issues demonstrate the lack of adequate guidance to enable teachers and principals to determine whether the decisions they make comply with constitutional standards.[1]  As this case demonstrates, decisions in such seemingly innocuous and benign activities as elementary school parties and fundraisers for elementary school art classes too often lead to protracted litigation.

---

[1]    *See, e.g., Morse v. Frederick*, 551 U.S. 393, 397, 127 S. Ct. 2618 (2007); *Good News Club v. Milford Central School*, 533 U.S. 98, 113, 121 S. Ct. 2093 (2001); *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829, 115 S. Ct. 2510 (1995); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 113 S. Ct. 2141 (1993); *Bd. of Education v. Mergens*, 496 U.S. 226, 250, 110 S. Ct. 2356 (1990); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S. Ct. 562 (1988); *Widmar v. Vincent*, 454 U.S. 263, 269-71, 102 S. Ct. 269 (1981); *Morgan v. Swanson*, --- F.3d ----, 2010 WL 2598393 (5th Cir. 2010); *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740 (5th Cir. 2009); *Croft v. Perry*, 562 F.3d 735 (5th Cir. 2009); *Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337 (5th Cir. 1999); Alan Brownstein, *The Nonforum as a First Amendment Category: Bringing Order Out of the Chaos of Free Speech Cases Involving School-Sponsored Activities*, 42 U.C. DAVIS L. REV. 717, 732 (2009) ("Brownstein"); *The Supreme Court, 2006 Term--Leading Cases, Student Speech*, 121 HARV. L. REV. 295, 296 (2007); Martin H. Redish & Kevin Finnerty, *What Did You Learn in School Today? Free Speech, Values Inculcation, and the Democratic-Educational Paradox*, 88 CORNELL L. REV. 62, 85-86 (2002).

The plaintiffs in this case are parents of students at Pattison Elementary School in the Katy Independent School District (the "KISD"), the remaining defendant.  Since this case was filed in 2006, the claims have been steadily whittled down by this court's orders and the parties' agreements. On December 30, 2009, this court issued a Memorandum and Order addressing—on stipulated facts—the only two remaining claims. (Docket Entry No. 58).  The first was an as-applied challenge to the time, place, and manner restrictions the school placed on student-to-student distribution of nonschool literature, including religious literature, on the Pattison Elementary School campus.  This court held that as a matter of law, the KISD's restrictions were constitutional.  The second issue was the plaintiffs' challenge to the school's blacking out one of twelve preset messages on an order form sent home with the children as a fundraising project.  The form allowed parents to order from a third-party vendor holiday cards featuring their child's  artwork, accompanied by one of the preset messages.  The only preset message the school blacked out was a quote from the New Testament. The other messages sounded more secular themes of the holiday season.  The parties stipulated that the KISD blacked out this one message "because of its particular religious viewpoint" in an effort to "avoid violating the Establishment Clause."  (Docket Entry No. 50, Ex. B at 4).  This court granted summary judgment to the school district, finding that no violation of the Establishment Clause was presented.  (Docket Entry No. 59).

The plaintiffs have moved for reconsideration of the second part of the December 30 opinion, on the holiday art-card order form.  The plaintiffs do not dispute this court's conclusion as to the Establishment Clause but argue that they did not claim a violation of that Clause.  Instead, the plaintiffs argue that the KISD's admitted viewpoint discrimination in blacking out the one explicitly religious message violated their First Amendment free speech rights and was not justified by the

District's desire to avoid violating the Establishment Clause.  (Docket Entry No. 60).  The KISD has responded.  (Docket Entry No. 61).

Based on a careful review of the reconsideration motion and response; the summary judgment motions, responses, and replies; the summary judgment record; and the applicable law, this court grants the plaintiffs' motion for reconsideration and analyzes the First Amendment claim. Having done so, this court concludes that the speech is subject to First Amendment review; that the admitted viewpoint discrimination violated the First Amendment; and the asserted justification—avoiding a possible violation of the Establishment Clause—does not absolve the constitutional violation.  The plaintiffs are ordered to submit an amended final judgment no later than **August 20, 2010.**  The reasons for this ruling are explained below.

## I.      The Summary Judgment Record

To raise funds to buy supplies for art classes, Pattison Elementary made student artwork available for parents and friends to purchase as "art holiday cards" through a company called "Its My Artwork" (sic).  The KISD sent the company's order form, with the name "Pattison Elementary" and the names of the art teachers written at the top, home with the children.  The parents completed the form and wrote a check to Pattison Elementary to order cards.  The completed cards had nothing that indicated any connection to the school or the KISD.  The cards were intended to be sent by the parents to whomever they chose, not by the school.

The parties stipulated to the following facts:

- As part of the card ordering process, the students created their own artwork.  The students['] own expression and artwork was printed in the holiday cards so that the students created personalized holiday cards.  Various messages were available on the order from for the students to choose to accompany their personalized holiday artwork expression.

- The fundraiser was sponsored by Pattison Elementary.

3

- The purpose of the fundraiser was to raise money to purchase additional supplies for art class.

- The blacked out box ("Box F") on the fundraiser order form originally read "And she shall bring forth a son, and thou shalt call his name Jesus; for He shall save his people from their sins. – Matthew 1:21."

- The District blacked out Block F because of its particular religious viewpoint. School officials blacked out Box F because it was the only box that referenced a specific deity and a specific religious quote from a religious book, and the District was trying to avoid violating the Establishment Clause.

(*Id*., Ex. B at 4).

The company-supplied order form with Box F redacted is part of the record. At the top are three blank lines. "Pattison Elem." is handwritten in the line marked "School/Organization." The line for "Artist's name" is blank. Under "Teacher/Other contact," someone wrote by hand the names "Jennifer Walker" and "Sandy Hill," who were Pattison Elementary's art teachers. (*Id.*, Ex. K). The order form contains text stating in part: "This year we are taking orders for Note Cards, Holiday Cards, and Bookmarkers as part of our annual fundraising activities. Its My Artwork (sic) will make these unique items from this child's personal artwork." (*Id.*, Ex. K (emphasis removed)). The URL for the company's website is included. Checks were to be made payable to "your school or organization." (*Id.*). The vendor, Its My Artwork, apparently provided this service to many schools and organizations, using the same form with the same preset text.[2]

---

[2]  The plaintiffs have identified http://www.itsmyartwork.com as the URL of a website operated by Its My Artwork. That website no longer appears to be active. An archived version of the website accessed using the Internet Archive shows that Its My Artwork also offered its services to individuals. For $20, any internet customer could order a set of 15 of his "personal artwork on a holiday card." The customer could "[s]elect from 12 seasonal greetings for Christmas, Hannukah, or Kwanzaa." *See* http://web.archive.org/web/20080613071851/www.itsmyartwork.com/catalog.htm. It is not clear whether this service was available when the art card fundraiser was held at Pattison Elementary.

After the KISD marked through the Box F message, the preset messages from which the purchaser could choose were:

- Wishing you a Merry Christmas and a Happy New Year

- Peace on Earth/Let it begin in our hearts.

- May your holiday spirit last forever. Happy Holidays!

- The gift of love - the gift of peace - the gift of happiness.  May these be yours at Christmas.

- Christmas is for children! Fortunately there's a little child in all of us! Have a very Merry Christmas

- May the lights of Chanukah/Fill your home with joy!

- Happy Chanukah

- Happy Chanukah! May the peace and joy of the season be with you and yours.

- Feliz Navidad y Prospero Año Nuevo

- May the ancestors bless you with a deep sense of heritage; Best Wishes for Kwanzaa

- Happy Kwanzaa/Celebrate Family, Community and Culture

(*Id.*).

Both parties moved for summary judgment on the constitutionality of the school's decision to black out Box F.  This court granted the KISD's motion and denied the plaintiffs' motion on that issue, finding no Establishment Clause violation.  The plaintiffs have moved for reconsideration, (Docket Entry No. 60), and the KISD has responded, (Docket Entry No. 61).  The plaintiffs' motion for reconsideration argues that the proper analysis is under the First Amendment free speech clause, and challenges the very brief statement in footnote 9 of the December 30, 2009 Memorandum and Order that the art card order forms were government speech, not private speech.

The parties' briefing on the reconsideration motion has sharpened the issues implicated by art card fundraiser.   The plaintiffs contend that the art-card program is private speech, not government speech or school-sponsored speech governed by *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S. Ct. 562 (1988).   The KISD urges this court to focus on the order form and hold that it was government speech.   Neither party argues that *Hazelwood* readily or fully applies to this case but they disagree as to whether *Hazelwood* would permit the school's decision to black out Box F.   Finally, the parties dispute whether a government interest in avoiding an Establishment Clause violation can justify restricting speech on the basis of the viewpoint it expresses and, if so, whether such a justification was present here.   These issues are analyzed below.

## II.      The Legal Standard

### A.      Motions for Reconsideration

The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration.  *Sheperd v. International Paper Co.*, 372 F.3d 326, 328 (5th Cir. 2004); *see also St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997). Reconsideration motions are generally analyzed under the standards for a motion to alter or amend judgment under Rule 59(e) or a motion for relief from a judgment or order under Rule 60(b). *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n. 10 (5th Cir.1998).   Rule 59(e) governs when the reconsideration motion is filed within 28 days of the challenged order or when the motion seeks reconsideration of an interlocutory order.  *Steadfast Ins. Co. v. SMX 98, Inc.*, No. 06-2736, 2009 WL 3190452 (S.D. Tex. Sept. 28, 2009) (drawing the line at 10 days instead of 28 days because the case was decided before the amendments to Rule 59 took effect on December 1, 2009. The plaintiffs moved for reconsideration 28 days after the summary judgment order, meaning that the motion falls under Rule 59(e).

6

A Rule 59(e) motion "calls into question the correctness of a judgment." *Templet v. Hydrochem Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004) (citing *In re TransTexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)). "A motion to alter or amend the judgment under Rule 59(e) 'must clearly establish either a manifest error of law or fact or must present newly discovered evidence' and 'cannot be used to raise arguments which could, and should, have been made before the judgment issued.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863-64 (5th Cir. 2003) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir.1990)). Relief is also appropriate when there has been an intervening change in the controlling law. *Schiller v. Physicians Resource Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). The Fifth Circuit warns that altering, amending, or reconsidering a judgment under Rule 59(e) is an extraordinary remedy that courts should use sparingly. *Templet*, 367 F.3d at 479; *see also* 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2810.1, at 124 (2d ed. 1995). The Rule 59(e) standard "favors denial of motions to alter or amend a judgment." *S. Constructors Group, Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993).

## B.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party

moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Id.* (emphasis in original); *see also Meecorp Capital Markets LLC v. Tex-Wave Industries LP*, 265

8

Fed. App'x 155, 157 (5th Cir. 2008) (per curiam) (unpublished) (quoting *Fontenot*, 790 F.2d at 1194).

## III. Analysis

### A. Whose Speech Was This? Government or Private Speech

The documents that make up the art-card fundraiser raise questions about three recognized categories of speech: government speech, private speech, and school-sponsored speech. The government may restrict its own speech, which includes speech expressed by others under government control, without implicating the Free Speech Clause. *Pleasant City Grove v. Summum*, --- U.S. ----, 129 S. Ct. 1125, 1131 (2009). Generally, the government may restrict only the time, place, and manner of private speech although, depending on the type of forum, other restrictions may be permissible. *See id.* at 1132; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46, 66, 103 S. Ct. 948 (1983). School-sponsored speech is a third category devised for the distinctive context of the public school. It is neither pure government speech nor pure private speech, but rather student expression that "may fairly be characterized as part of the school curriculum," which means that it is "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271, 108 S. Ct. 562 (1988). Such speech may be regulated by the school "so long as editorial control over the style and content of student speech in school sponsored expressive activities is reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S. Ct. 562.[3]

---

[3] A school may also regulate student speech at school that "would substantially interfere with the work of the school or impinge upon the rights of other students." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 511-14, 89 S. Ct. 733 (1969); *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 442-43 (5th Cir. 2001). The *Tinker* analysis does not apply here because the expression occurred outside the "school

A split exists among the circuit courts as to whether *Hazelwood* requires that school regulation of school-sponsored speech to be viewpoint neutral. *Compare Fleming v. Jefferson County Sch. Dist.*, 298 F.3d 918, 926-28 (10th Cir. 2002) (viewpoint neutrality not required), and *Ward v. Hickey*, 996 F.2d 448, 454 (1st Cir. 1993) (same), with *Searcey v. Harris*, 888 F.2d 1314, 1319 n. 7, 1325 (11th Cir. 1989) (viewpoint neutrality required), and *Planned Parenthood of S. Nev., Inc. v. Clark Co. Sch. Dist.*, 941 F.2d 817, 930 (9th Cir. 1991) (en banc) (same). The Fifth Circuit has not resolved this issue. *See Chiras v. Miller*, 432 F.3d 606, 615 n. 27 (5th Cir. 2005). The Supreme Court has not decided whether "a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination." *Good News Club v. Milford Central School*, 533 U.S. 98, 113, 121 S. Ct. 2093 (2001).

The threshold issue is whether the order form that the KISD redacted was government speech or private speech. The plaintiffs argue that by participating in the art card program, including sending the order forms to parents, Pattison Elementary created a forum for student expression but did not determine the content of that expression so as to create government speech. The plaintiffs argue that the District is "merely paying a third-party vendor (It's My Artwork) to print the *private* art work of students along with the *privately chosen* messages of individual card purchasers," so that "the District has no authority to censor the private viewpoints either of the students or the purchasers." (Docket Entry No. 60 at 12 (emphasis in original)). The KISD responds that the order form it sent home from school with the students must be viewed separately, and the order form was government speech.

---

environment," on which *Tinker* focused, *see Tinker*, 393 U.S. at 506, 89 S. Ct. 733, and the KISD does not argue that including the Box F message on the order form would have been disruptive.

10

The plaintiffs emphasize that private speech facilitated by government funding or supervision does not thereby become government speech. In *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829, 115 S. Ct. 2510 (1995), for example, the Supreme Court struck down the University of Virginia's refusal to allocate any of its student publication funds to a particular publication because of its religious Christian message. The Court held that the university had created a limited public forum for expression by making funds available for student publications. Although the university facilitated the private speech by funding it, the speech was the students' speech, not the university's. *Id.* at 833-36, 125 S. Ct. 2510. University officials made the publication funds available not so students could promote the university's message but rather to "encourage a diversity of views from private speakers." *Id.* at 834, 125 S. Ct. 2510. The university had asked the student groups who wanted to use university funds to pay outside vendors to sign a statement that the benefits given to them "should not be misinterpreted as meaning that those organizations are part of or controlled by the University, that the University is responsible for the organizations' contracts or other acts or omissions, or that the University approves of the organizations' goals or activities." *Id.* at 824, 125 S. Ct. 2510. This demonstrated to the Court that the individual groups chose their own messages. "Having offered to pay the third-party contractors on behalf of private speakers who convey their own messages," the Court held, "the University may not silence the expression of selected viewpoints." *Id.* at 834-35, 115 S. Ct. 2510.

Similarly, in *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 121 S. Ct. 1043 (2001), the Supreme Court held unconstitutional a restriction in the Legal Services Corporation ("LSC") Act that prevented attorneys receiving funding under the statute from accepting a legal representation that involved an effort to amend or otherwise challenge welfare law. As the Court reasoned, "[a]lthough the LSC program differs from the program at issue in *Rosenberger* in that its purpose

11

is not to 'encourage a diversity of views,' the salient point is that, like the program in *Rosenberger*, the LSC program was designed to facilitate private speech, not to promote a governmental message." *Velazquez*, 531 U.S. at 542, 121 S. Ct. 1043.  LSC lawyers spoke on behalf of their clients, not on behalf of the government.  Because the government had provided a subsidy rather than created a forum, the Court found that the limited-forum cases were not strictly controlling but were instructive.  Although those cases permitted some restrictions on speech, the government had—for reasons not relevant to the present case—gone too far in preventing LSC attorneys from advocating change to the welfare system.  *Id.* at 540-49, 121 S. Ct. 1043.

*Rosenberger* and *Velazquez* limit the extent to which the government can create a program to facilitate private speech and then restrict the message conveyed by the private speaker based on viewpoint.  The parties agree that in determining whether speech is the government's, the "key inquiry is the 'degree of governmental control over the message,'" that "[s]peech constitutes government speech when it is 'effectively controlled' by the government."  *Pelt & Skins, LLC v. Lanreneau*, 448 F.3d 743, 743 (5th Cir. 2006) (quoting *Johanns v. Livestock Mktg., Assoc.*, 544 U.S. 550, 125 S. Ct. 2055, 2062-63 (2005)).

In *Johanns*, the Supreme Court explained that speech is the government's when "the government sets the overall message to be communicated and approves every word that is disseminated," even when the government "solicits assistance from nongovernmental sources in developing specific messages."  *Johanns*, 544 U.S. at 562, 125 S. Ct. 2055.  In that case, Congress had directed the Secretary of Agriculture to impose a mandatory assessment on beef producers, which would be used to promote the consumption of beef by creating an advertising campaign. Congress directed the Secretary to create an industry operating committee that would create advertising materials, the content of which was subject to the approval of the Secretary.  Without

considering whether the operating committee was a governmental entity, the Court rejected the argument that the resulting advertisements were private speech because it found that the "message of the promotional campaigns [was] effectively controlled by the Federal Government itself." *Id.* at 560.   The message was "from beginning to end the message established by the Federal Government" because the campaign was implemented at the behest of Congress and the Agriculture Secretary, all parties involved in developing the message were answerable to and/or appointed by the Secretary, the Agriculture Department reviewed every proposed campaign, the Department staff participated in developing campaigns, and the Secretary "exercise[ed] final approval authority over every word used in every promotional campaign." *Id.* at 560-61.

The District argues that the art-card order form must be viewed separately and that it is government speech.  The plaintiffs argue that the order form must be viewed as part of the art-card program, which was private speech.  Neither argument is wholly correct.  The order form was a separate document, but it is properly analyzed in the context of the art-card program it facilitated. The order form was clearly written by Its My Artwork, a third-party vendor.  The vendor had selected the twelve preset message options for the parents to choose the one they wanted in the cards they purchased.  The order form made it clear that the vendor made these selections, not the school. The form made it clear that the parents were to select the art work they wanted and the accompanying message from the options provided.

The only changes the school made to the order form other than redacting Box F were to identify the school and the art teachers.  The art-card program was  to create holiday cards using the children's own artwork, selected by the parents, accompanied by the parents' choice among the preset messages, to be sent by the parents.  Unlike the Secretary of Agriculture in *Johanns*, the school was not using the program, including the order form, to "promote a particular policy of its

13

own," or "to convey a governmental message." *Rosenberger,* 515 U.S. at 833, 115 S. Ct. 2510.  In *Johanns*, the Court held that "[w]hen, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages."  544 U.S. at 562, 125 S. Ct. 2055.  In this case, even though the school did not simply leave it entirely to the parents to pick any message they wanted, the school did not set the "overall message to be communicated" or "approve every word that is disseminated" in the cards; that was up to the parents who chose the combination of the art work for the cards and the accompanying message.

Nor do the facts of this case show government speech under the analysis in *Arkansas Education Television Commission v. Forbes*, 523 U.S. 666, 118 S. Ct. 1633 (1998).  In that case, the Supreme Court held that a state-owned, public broadcaster engages in its own "speech activity" when exercising editorial control over its broadcast.  The Court compared the ordinary editorial decisions of a public broadcaster to "a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum." *Id.* at 674, 118 S. Ct. 1633.  In such situations, judicial review is inappropriate because it would interfere with the editorial discretion inherent in the nature of the medium, which requires selecting or excluding certain private speech on the basis of its content and viewpoint.  Rather than finding that the television station was a forum in which the broadcaster was entitled to discriminate on the basis of viewpoint, the Court decided that the public broadcaster's exercise of "editorial discretion and presentation of its programming" was itself government speech not subject to the Free Speech Clause.  When the broadcaster held a televised debate for political candidates, however, it had opened a nonpublic forum in which its regulations had to be viewpoint neutral. *Id.* at 678-82, 118

14

S. Ct. 1633; *see also Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005)  (describing *Forbes* as holding that "a political candidate[s'] debate is an exception to the general rule that state-owned media engages in government speech by selecting and broadcasting programs").

Similarly, in *Chiras*, 432 F.3d at 614-15, the Fifth Circuit held that the Texas State Board of Education engaged in its own speech when selecting textbooks for the official curriculum. "When the [Board] devises the state curriculum for Texas and selects the textbook with which teachers will teach to the students, it is the state speaking, and not the textbook author." *Id.* at 614.  It was "necessary for the Board to exercise editorial judgment," the exercise of which "will necessarily reflect the viewpoint of the Board members." *Id.* at 615.  Rather than "establish a forum for the expression of the views the various authors of textbooks and other instructional materials might want to interject into the classroom" or "encourage a 'diversity of views,'" as in *Rosenberger*, the Board "'enlist[ed] private entities to convey its own message.'" *Id.* at 615 (quoting *Rosenberger*, 515 U.S. 833-34, 115 S. Ct. 2510); *see also Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 118 S. Ct. 2168 (1998) (holding that an art grant program requiring the NEA to judge the content of proposed projects did not implicate a free speech analysis because the very nature of the NEA is to judge the merits of artists' work); *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 123 S. Ct. 2297 (2003) (declining to apply free speech review to a statute conditioning federal library funding on the libraries' use of internet content filters on public computers because it would be "incompatible with the discretion that public libraries must have to fulfill their traditional missions").

In the present case, in sending the art-card order form home to the parents of elementary art students, Pattison Elementary was not acting like "a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum." *See Forbes*, 523 U.S. at 674, 118 S. Ct. 1633.  To the contrary, the school merely sent

a third-party's order form home to invite interested parents to create a holiday card using their child's own art and one of several messages the vendor provided.  The order form invited parents and children to create holiday cards that would be sent privately, with no evident connection to the school.  This is far removed from the "traditional mission" of a public school exemplified in such activities as choosing textbooks or a commencement speaker.

For similar reasons, the KISD's reliance on *Warnock v. Archer*, 380 F.3d 1076 (8th Cir. 2004), is not persuasive.  That case addressed a school superintendent's practice of conducting prayers at mandatory teacher-training meetings and requiring teachers to attend inservice meetings at a local religious college where a prayer was offered.  The prayers offered were, in the court's words, "official prayers," offered at "official" school functions.  *Id.* at 1081.  Sending a third-party order form home with an invitation for parents to participate in a fundraiser that benefits the school but is otherwise separate from it presents a far different case.  The fact that the school sent the order form to the parents does not make the contents of the form pure government speech.  It was evident that the form was prepared by a third party and that it was the third party that created the twelve preset messages for the parents to choose.  The transmittal of the form, including the message options it included, did not make that form or those messages government speech.  The form created a forum for, or facilitated, the creation of the cards, which was clearly private expression.  The school did not use the vendor to transmit specific information pertaining to the creation of the school's own message or policy; this was a fundraising program used by many other organizations of various types.

Failing to redact one of the preset messages would not have made it the school's own message.  Sending a third-party vendor's order form home with children, for a program that will not take place at school and when completed will not have a visible connection to the school, is far

16

different from presenting a specific speaker for a graduation ceremony or other official event at the school, or from sponsoring student work that will be permanently affixed to the school. *Cf. Forbes*, 523 U.S. at 674, 118 S. Ct. 1633 (suggesting that a University engages in its own speech by selecting a commencement speaker and that any public institution does so by selecting speakers for a lecture series); *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 923-24 (10th Cir. 2002) (refusing to hold that even tiles designed by students and permanently affixed to the school constituted government speech; finding them to be school-sponsored speech governed by *Hazelwood*); *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1015-17 (9th Cir. 2000) (holding that a teacher's posting anti-gay literature on a hallway bulletin board was government speech because the bulletin boards at the school were "vehicles for conveying a message from the school district").

The facts that the vendor preselected twelve separate message options in the order form and did not allow the parents and students complete license to say whatever they wanted in the printed text of the cards did not make the order form—or the cards it was used to create—government speech. The school was not setting the overall message to be communicated in the cards that the parents would create using the order form. Nor was the school approving every word that would be disseminated when the parents sent the cards. The order form facilitated speech by the parents and students. The order form cannot properly be viewed as entirely separate from the forum it created or as pure government speech, as the KISD argues.[4]

_____

[4] The appropriateness of viewing the order form in the context of the program it announced is supported by cases dealing with First Amendment issues in public schools. In cases addressing school programs to send flyers prepared by third parties home to parents, the courts analyze whether schools can refuse to allow some flyers to be distributed while allowing others by focusing on the program or event that the flyers announce, not the words of the flyers standing alone or the fact that the school distributes them. *See, e.g., Child Evangelism Fellowship of Maryland, Inc. v. Montgomery Cnty. Public Schs.*, 373 F.3d 589 (4th Cir. 2004) (holding that a school district's refusal to allow a flyer notifying parents of about an evangelical religious group holding after-school meetings for an elementary school was unconstitutional viewpoint discrimination); *Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044 (9th Cir. 2003) (holding that sending flyers advertising

There is simply too loose and attenuated a connection between the order form, the cards it was used to create, and the school's role to make the art-card form pure government speech exempt from First Amendment analysis.

### B.        Does a *Hazelwood* Analysis Apply?

The Supreme Court has identified a third, hybrid category of speech in public school cases, school-sponsored speech, or *Hazelwood* speech, after the case that first recognized it.  *See Hazelwood*, 484 U.S. at 270-73, 108 S. Ct. 562.  Because the speech at issue is not pure government speech, and because the doctrines overlap to such a great extent, *see Morse*, 551 U.S. at 429-30, 127 S. Ct. 2618 (Breyer, J., concurring in the judgment in part and dissenting in part), a *Hazelwood* analysis is appropriate for the sake of completeness.  The KISD argues that if the speech is not pure government speech, it may be analyzed under *Hazelwood*.  (Docket Entry No. 61, pp. 13-14).  The plaintiffs disagree that *Hazelwood* applies.

School-sponsored speech includes "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school."  *Hazelwood*, 484 U.S. at 271, 108 S. Ct. 562.  These speech activities are school sponsored because they "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences."  *Id.*  School officials may "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are

---

a Christian summer camp off campus, with a disclaimer clarifying that the school did not endorse the group, would not have violated the Establishment Clause).  Although these cases are distinguishable because they involve access to a send-a-flyer-home program at the school, rather than the contents of the flyers, they do show that the mere fact the school sends flyers home does not make the flyer's contents the school's speech.

reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S. Ct. 562.  One justification for giving schools this additional authority is to ensure that "the views of the individual speaker are not erroneously attributed to the school." *Id.* at 271, 108 S. Ct. 562.  This is important, among other reasons, so that the school may refuse to sponsor student speech that would "impinge upon the rights of other students" or "associate the school with any position other than neutrality on matters of political controversy." *Id.* at 271-72, 108 S. Ct. 562.  According to the Supreme Court, this level of authority was "consistent with our oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Id.* at 273, 108 S. Ct. 562.  Federal courts should only intervene in decisions to restrict school-sponsored speech when the decision has "no valid educational purpose." *Id.*

The speech at issue in *Hazelwood* was a high school newspaper published every three weeks by students in the school's Journalism II class.  It was funded by the school board, supplemented by advertising sales.  The newspaper's faculty adviser submitted page proofs to the school principal before publication.  The *Hazelwood* case arose after the principal censored a story describing the experiences of three pregnant students and another story in the same issue discussing the impact of divorce on students.  The pregnancy story did not include the three students' names, but the principal was concerned they might be identifiable regardless.  The divorce story included comments from one student identified by name—although, unknown to the principal, the name was later removed—to which the principal felt the student's parents should have been invited to respond on the record.  Because the principal was shown the proofs so close to press time, changes could not be made, and the two newspaper pages containing these two stories were withheld from publication entirely.  *Id.* at 262-64, 108 S. Ct. 562.  Applying the new standard it crafted, the Supreme Court

held that the student newspaper was school-sponsored speech and that the principal acted reasonably in redacting the two pages that concerned him. *Id.* at 274-76, 108 S. Ct. 562.

*Hazelwood* applies to the intermediate category of school-sponsored expression, when "students, parents, and members of the public might reasonably perceive [expression] to bear the imprimatur of the school" and the expression occurs in a curricular activity. The school arranged with Its My Artwork and sent the order form inviting parents to participate to raise funds to purchase school art supplies. The order form stated that the fundraiser was organized by the school, included the names of the school's art teachers, and it instructed parents to make checks out to the school. The holiday cards had no visible tie to the school and were handled solely by the parents (or other similar individuals who ordered the cards using the students' order forms). Viewing the order form entirely separate from the art-card program, it did have the imprimatur of the school. Viewing the order form in the context of the program, the school's connection is far more attenuated.

Even if the order form bears the imprimatur of the school, neither the program nor the expression at issue—the text of the holiday cards—occurred in the context of curricular activities. Courts have disagreed over how broadly to read this aspect of *Hazelwood*, in part because the facts of that case were much narrower than the language used by the Court in describing its rule. *See* Brownstein, 42 U.C. DAVIS L. REV. at 763 (stating that courts split between focusing on the language in *Hazelwood* and the facts of *Hazelwood*, and suggesting a focus closer to the latter that would require courts to "distinguish between curricular and non-curricular activities"). In *Bannon v. Sch. Dist. of Palm Beach County*, 387 F.3d 1208, 1214-15 (11th Cir. 2004) (per curiam), the court held that *Hazelwood* governed a "school beautification project" in which students were invited to paint murals on plywood panels that were shielding construction areas on campus. The "beautification project was designed to impart particular knowledge and skills to student participants

and audiences; it allowed student participants to express themselves artistically, allowed student audiences to appreciate their fellow students' artwork, and promoted school spirit, among other things." *Id.* at 1215.  It did not change the analysis that students did not earn grades or credit for working on the murals, that they worked on Saturdays instead of during school hours, or that it required a separate participation fee. *Id.* at 1214-15.  By arguing to the contrary, the plaintiffs had ignored "how broadly the Supreme Court has defined school curricula for *Hazelwood's* purposes." *Id.* at 1215.  Similarly, in *Fleming*, 298 F.3d at 918, the Tenth Circuit held that *Hazelwood* applied to a project at Columbine High School in which students were given the opportunity to create artwork on tiles that would be permanently installed in the school's hallways.  The court read the language "designed to impart particular knowledge or skills to student participants and audiences" in *Hazelwood* to mean "activities that affect learning, or in other words, affect pedagogical concerns." *Id.* at 925.  That standard was satisfied because the project was intended to "reacquaint[] the students with the school and participat[e] in community healing" after the tragic shootings at the school. *Id.* at 931.

The Fifth Circuit has suggested that it favors a narrow approach based on the facts of *Hazelwood*.  That court stated, in deciding that *Hazelwood* did not apply to Texas's textbook selections, that "the student newspaper [is] an exception to the general rule that schools engage in government speech when they set and implement education policy through the curriculum." *Chiras*, 432 F.3d at 616.  Recently, in *Morgan v. Swanson*, --- F.3d ----, 2010 WL 2598393, at *6 (5th Cir. June 30, 2010), the Fifth Circuit decided without further analysis that it did not need to apply *Hazelwood* in deciding a Rule 12(b)(6) motion involving a "winter break" party at school in which students exchanged small gifts because the facts alleged "provide[d] no indication that the events at issue were curricular or that the speech was inconsistent with the school's 'basic educational

mission.'" *Id.* (quoting *Hazelwood*, 484 U.S. at 266, 108 S. Ct. 562).   The court supported its decision not to apply *Hazelwood* by noting that "some of the alleged speech at issue occurred after school hours." *Id.*  The Fifth Circuit appears to disagree with the reasoning in *Bannon* and *Fleming,* suggesting that the art-card fundraiser should not be analyzed under *Hazelwood*.

Even under the approach used in *Bannon* and *Fleming*, it is a stretch to find that the holiday art cards were curricular.  As noted, the parents could select their child's art work for the holiday cards, but it is unclear whether the art work was created by the students, under teachers' supervision for the purpose of the holiday cards, or if the parents simply used existing art work.  And the inclusion of the art work in a holiday card had no curricular purpose.  The cards were sent to the parents, for them to send to whomever they chose.  In *Bannon* and *Fleming*, it was important that the student work at issue would become a permanent part of the school.  The cards at issue here would not appear at school, even briefly.  And in *Bannon* and *Fleming*, it was important that the expressive activity was the result of a collaborative effort by the school community.  The art-card program, by contrast, was done separately by each student's family, away from the school.

There is no indication in the record that the art teachers used the holiday card program for any curricular purpose as well as a fundraising purpose.  Although some school fundraising projects may also have a curricular purpose, see *Planned Parenthood of Southern Nevada*, 941 F.2d at 828-29, the fact that a school activity is intended to raise money for school purposes does not necessarily make it curricular as well.  *See Demmon v. Loudoun Cnty. Pub. Schs.*, 342 F.Supp.2d 474, 488-90 (E.D. Va. 2004) (distinguishing *Fleming* and holding that a fundraiser allowing parents to purchase bricks commemorating student attendance and participation that would become a permanent walkway on campus was not curricular).

Finally, if the art-card fundraiser was eligible for review under *Hazelwood*, the KISD's

actions would be justified unless there was "no valid educational purpose" behind blacking out Box

F. The restriction must be "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484

U.S. at 273, 108 S. Ct. 562. *Id*.[5]   Courts have found this final element satisfied if the action is

reasonably related to "the school district's desire to avoid controversy within a school environment."

*Fleming*, 298 F.3d at 925-26 (collecting cases).  "Indeed, the pedagogical concern in *Hazelwood*

---

[5]  As noted, the circuits are split on whether *Hazelwood* permits schools to restrict speech based on its viewpoint.  The Fifth Circuit has not taken a position.  *See Chiras*, 432 F.3d at 615 n. 27 (noting the circuit split and stating that "[b]ecause we conclude that *Hazelwood* does not apply in this case, we do not consider whether *Hazelwood* requires viewpoint neutrality.").  The First and Tenth Circuits do not require viewpoint neutrality to survive a *Hazelwood* analysis, *see Fleming*, 298 F.3d at 926-29; *Ward v. Hickey*, 996 F.2d 448, 452 (1st Cir. 1993), but the Second and Eleventh Circuits do, *see Peck ex rel. Peck v. Baldwinsville Central Sch. Dist.*, 426 F.3d 617, 632-33 & n.9 (2d. Cir. 2005); *Searcey v. Harris*, 888 F.2d 1314, 1319 n. 7 (11th Cir. 1989).  The *en banc* Ninth Circuit has applied the viewpoint-neutrality-requirement applicable in ordinary forum cases in a *Hazelwood* analysis, *Planned Parenthood of Southern Nevada*, 941 F.2d at 829, but a later panel of the court criticized that result, *Downs*, 228 F.3d at 1010-11.  A Third Circuit panel held that viewpoint neutrality is not required because "a viewpoint-based restriction . . . may be reasonably related to legitimate pedagogical concerns," *C.H. ex rel. Z.H. v. Oliva*, 195 F.3d 167, 172 (3d Cir. 1999), but the *en banc* court vacated that holding, 197 F.3d 63 (3d Cir. 1999), and affirmed on other grounds without reaching the viewpoint-neutrality issue, 226 F.3d 198 (3d Cir. 2000).

In *Hazelwood*, the Court suggested that it was appropriate for schools to restrict speech based on its viewpoint.  The Court stated:

> A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order, or to associate the school with any position other than neutrality on matters of political controversy.

*Hazelwood*, 484 U.S. at 272, 108 S. Ct. 562 (internal citation and quotation marks omitted).  The concurring opinion in *Bannon* recognized that "[t]his is the epitome of discrimination based on viewpoint."  *Bannon*, 387 F.3d at 1218 (Black, J., concurring).  As the Tenth Circuit reasoned, *Hazelwood's* "specific reasons supporting greater control over school-sponsored speech, such as determining the appropriateness of the message, the sensitivity of the issue, and with which messages a school chooses to associate itself will often turn on viewpoint-based judgments."  *Fleming*, 298 F.3d at 928.  "[A] school must 'retain the authority' to decide with which positions it will associate itself."  *Id.* at 928 n.8 (quoting *Hazelwood*, 484 U.S. at 272, 108 S. Ct. 562).

23

itself was to avoid the controversial subjects of pregnancy and divorce in a school setting because of the potentially disruptive nature of such subjects upon young students." *Id.* at 926. *See, e.g.,* *Curry v. Hensiner*, 513 F.3d 570, 578 (6th Cir. 2008) (upholding school's decision to prevent a student from selling candy cane ornaments with religious messages as part of a school project; finding that the legitimate pedagogical concerns of preventing other students from being offended and/or subjected to unwanted religious messages that might conflict with their parents' religious teachings motivated the decision); *Bannon*, 387 F.3d 1208 (finding that the legitimate pedagogical concern of avoiding disruption to the learning environment caused by controversial student-painted murals with overtly religious messages permitted the school to remove the murals); *Fleming*, 298 F.3d at 933-34 (holding that a high school's desire to avoid a religious debate that would be disruptive to the learning environment was a legitimate pedagogical concern). In this case, the KISD has not raised disruption of the learning environment as a concern. Because the activity at issue is so far removed from the classroom and campus, such a concern would not be present.

The *Hazelwood* analysis does not apply to make validate the choice made by the KISD.

### C.      Was the Viewpoint Discrimination Constitutionally Justified by a Desire to Avoid Violating the Establishment Clause?

The KISD argues that even if the speech at issue was not purely government expression or protected under *Hazelwood*, the  interest in avoiding an Establishment Clause violation is a valid "defense" against a First Amendment claim. The parties have stipulated that Box F was blacked out because of its religious "viewpoint."[6]  The Supreme Court has held that an interest in avoiding an

---

[6] It is arguable that the label "viewpoint discrimination" is not properly applied to the facts of this case. The record suggests that eliminating Box F could be viewed as a content-based decision, rather than a viewpoint-based one.  But the Supreme Court has recently emphasized the binding effect of factual stipulations, *Christian Legal Soc. v. Martinez*, --- S Ct. ----, 2010 WL 2555187, at *9 (Jun. 28, 2010), and the parties have stipulated that the District blacked out Box F "because of its particular religious viewpoint.

24

Establishment Clause violation can, in some circumstances, justify a government official's restricting private speech on the basis of content. *Widmar v. Vincent*, 454 U.S. 263, 269-71, 102 S. Ct. 269 (1981).  In *Rosenberger*, 515 U.S. at 837-46, 115 S. Ct. 2510, the Court dismissed the argument that  the University of Virginia's Establishment Clause interest justified the viewpoint-based restrictions the school imposed on a religious student newspaper.  "To obey the Establishment Clause, it was not necessary for the University to deny eligibility to student publications because of their viewpoint."  *Id.* at 845, 115 S. Ct. 2510.  In *Good News Club*, the Supreme Court reserved the question of whether avoiding an Establishment Clause violation would be a sufficient government interest to justify viewpoint discrimination.  533 U.S. at 113, 120, 121 S. Ct. 2093.  The Court found it unnecessary to reach that question because it held that the restrictions imposed on which groups could meet on campus were not necessary to avoid violating the Establishment Clause. *Id.*; *see Knight v. Connecticut Dept. of Public Health*, 273 F.3d 156, 165 (2d Cir. 2001) (distinguishing *Good News Club*); *Child Evangelism Fellowship v. Montgomery Cnty. Public Schs.*, 373 F.3d 589, 594 (4th Cir. 2004)(assuming "that violation of the Establishment Clause constitutes a governmental interest compelling enough to overcome viewpoint discrimination," but not deciding the question because, like the *Good News Club* Court, it held that the facts before it "would not be likely to violate the Establishment Clause."); *Wigg v. Sioux Falls Sch. Dist.*, 382 F.3d 807, 812-13 (8th Cir. 2004) (same).

The issue is whether an unredacted art-card order form would have violated the Establishment Clause.[7]

_____

[7]  Although the Supreme Court has framed the analysis as determining whether an *actual* Establishment Clause violation would have occurred, one court has held that the test should be less restrictive.  In *Marchi*, 173 F.3d 469, 477 (2d Cir. 1999), the Second Circuit looked to whether "the school authorities could reasonably be concerned that communications of this sort would expose [the school] to non-frivolous Establishment Clause challenges."  Because the case law provides school officials with "inadequate guidance

### D.      The KISD's Establishment Clause Interest

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion."  U.S. CONST. amend. 1.  The Clause applies to the states through the Fourteenth Amendment.  *See Wallace v. Jaffree*, 472 U.S. 38, 42 n. 10, 105 S. Ct 2479 (1985) (citing *Everson v. Bd. of Educ.*, 330 U.S. 1, 15-16, 67 S. Ct. 504 (1947)).  "The touchstone for our [Establishment Clause] analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary County v. ACLU*, 545 U.S. 844, 860, 125 S. Ct. 2722 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S. Ct. 266 (1968)); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532, 113 S. Ct. 2217 (1993) ("In our Establishment Clause cases we have often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general.").  The Establishment Clause "inquiry is shaped by the educational context in which it arises: 'First Amendment rights [] must be analyzed in light of the special characteristics of the school environment.'" *Christian Legal Soc.*, --- S Ct. ----, 2010 WL 2555187, at *14 (quoting *Widmar*, 454 U.S., at 268, n. 5, 102 S. Ct. 269).

Under the standard set out in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105 (1971), a government action will survive an Establishment Clause challenge if: (1) it has a secular purpose; (2) its primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive government entanglement with religion.  *Id.* at 612-13 (citations omitted).  If any of the three elements is absent, the government action violates the Establishment Clause.  *See Comer v. Scott*, ---F.3d ----, 2010 WL 2636726, at *3 (5th Cir. 2010).  The Fifth Circuit applies the *Lemon* test in

---

as they struggle to comply with constitutional requirements," Brownstein, 42 U.C. DAVIS L. REV. at 721, this standard is both practical and realistic in allowing reasonable, considered judgments in the face of competing constitutional obligations.

Establishment Clause cases. *See, e.g., id.* at *3-4; *Croft v. Perry*, 562 F.3d 735, 742 (5th Cir. 2009) (characterizing *Lemon* as a "general framework for analyzing Establishment Clause challenges.").

There is no dispute that the KISD would have had a secular purpose had it made all twelve boxes available on the art-card order form. The school's goal was to raise money for the art classes at Pattison Elementary. The issue is the second and third parts of *Lemon*.

"*Lemon's* second prong asks whether, irrespective of the School Board's actual purpose, 'the practice under review in fact conveys a message of endorsement or disapproval.'" *Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 346 (5th Cir. 1999) (quoting *Doe v. Santa Fe Independent Sch. Dist.*, 168 F.3d 806, 817 (5th Cir. 1999)). This analysis is similar to the "endorsement" test articulated by the Supreme Court. *Id.* "Under either the second *Lemon* prong or the endorsement test, the Supreme Court has cautioned that a government practice may not aid one religion, aid all religions, or favor one religion over another." *Id.* "Whether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Allegheny Cnty. v. ACLU*, 492 U.S. 573, 593-94, 109 S. Ct. 3086 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687, 104 S. Ct. 1355 (1984) (O'Connor, J., concurring)).

A long list of cases addresses endorsement and related issues. None is similar to the present case. Both *Lynch* and *Allegheny County* involved public, government-sponsored holiday displays. In *Lynch*, the city of Pawtucket, Rhode Island set up an annual Christmas display in a downtown park owned by a nonprofit organization. The display, all components of which were owned by the city included, a crèche—or traditional nativity scene—and "among other things, a Santa Claus

house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads 'SEASONS GREETINGS.'" *Lynch*, 465 U.S. at 671, 104 S. Ct. 1355.  The Court, applying *Lemon*, held that this did not violate the Establishment Clause.  *Id.* at 681-83, 104 S. Ct. 1355.  Justice O'Connor concurred, writing separately to apply the endorsement test, under which she concluded that the crèche did not "communicate a message that the government intends to endorse the Christian beliefs represented by the crèche."  *Id.* at 692, 104 S. Ct. 1355 (O'Connor, J., concurring).  Although the surrounding display did not "neutralize" the religious content of the crèche, it provided important context that allowed an observer to understand that the display was not promoting that religious content but rather celebrating a public holiday with "very strong secular components and traditions."  *Id.*  Because of the "ubiquity" of such holiday displays in society and the history of their use, Pawtucket's display did "not have the effect of communicating endorsement of Christianity."  *Id.* at 693, 104 S. Ct. 1355.

The holiday display at issue in *Allegheny County* was a crèche displayed prominently in the county courthouse, which included an angel holding a banner with the Biblical phrase "Gloria in Excelsis Deo!" (Glory to God in the highest).  The crèche was surrounded on three sides by a wooden fence, which, for most of the holiday season, was bordered with red and white poinsettia plants.  The county also placed a small evergreen tree beside each of the fence's two endpoints.  Christmas carolers performed in front of the display during the lunch hour in December.  There were no "figures of Santa Claus or other decorations."  492 U.S. at 579-81, 109 S. Ct. 3086.  The Court held that the crèche display in the courthouse was an unconstitutional endorsement of religion.[8]

---

[8]  *Allegheny County* also involved a second display at a different building, which consisted of a 45-foot Christmas tree, an 18-foot Hanukkah menorah, and a sign celebrating liberty.  The court upheld this second display 6-3 in a fractured set of opinions.  Justice Blackmun, writing for himself, found it acceptable, as did

28

Unlike in *Lynch*, it was not counterbalanced by other, nonreligious elements like Santa Claus and his reindeer.  It was the focal point of the display, particularly because it was located in the most prominent part of the building.  The surrounding flowers and trees served only to accentuate it.  *Id.* at 598-602, 109 S. Ct. 3086.  That there was a sign indicating the crèche was owned by a Catholic group, not the government, did not remove the endorsement effect of the display but instead communicated that the county supported the group as well as the religious message.  The Court also rejected the county's argument that the display was acceptable because Christmas is a national holiday with secular aspects.  "The government may acknowledge Christmas as a cultural phenomenon, but under the First Amendment it may not observe it as a Christian holy day by suggesting people praise God for the birth of Jesus."  *Id.* at 601, 109 S. Ct. 3086.  In responding to the dissent, the Court stated that "[w]hatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion. . .), it certainly means at the very least that government may not demonstrate a preference of one particular sect or creed (including a preference for Christianity over other religions)."  *Id.* at 605, 109 S. Ct. 3086.

The Supreme Court has applied the endorsement analysis and the second *Lemon* prong in the public school setting.  In *Widmar*, 454 U.S. at 270-77, 102 S. Ct. 269, after holding that the university's interest in complying with the Establishment Clause could justify content discrimination, the Court held that opening campus facilities to religious student groups would not have violated the Establishment Clause.  The Court stated that the proper analysis was not whether establishing a forum for religious speech would violate the Establishment Clause, but rather whether creating a forum open to all speech, including religious speech, would have the primary effect of

Justice O'Connor, writing for herself.  The four dissenting justices agreed, finding no reason to distinguish between the two displays.  Justice Brennan, Justice Marshall, and Justice Stevens all would have struck down both displays.

advancing religion. *Id.* at 273, 102 S. Ct. 269.  Although it was possible that an open forum would benefit religious groups by giving them access to school facilities, any such benefits would be "incidental." *Id*. at 274, 102 S. Ct. 269.  This was so because "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices," just as it does not show approval of the views of various political groups on campus.  *Id.*  The school made its facilities available to a broad class of groups and was allowed, consistent with the Establishment Clause, to extend those general benefits to religious groups, just as cities can extend police and fire protection to churches.  *Id.*  The Court concluded that, "[a]t least in the absence of empirical evidence that religious groups will dominate [the university's] open form. . . the advancement of religion would not be the forum's 'primary effect'" *Id.* at 275, 102 S. Ct. 269.

Similarly in *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 113 S. Ct. 2141 (1993), the Court held that a school district could not "deny a church access to school premises to exhibit for public viewing and for assertedly religious purposes, a film series dealing with family and child-rearing issues faced by parents today." *Id.* at 387, 113 S. Ct. 2141.  The district opened school property for after-hours use of "social, civic, and recreational" purposes but, as in *Widmar*, defended its decision to bar the film screenings by invoking a fear of violating the Establishment Clause. *Id.* at 394-95, 113 S. Ct. 2141.  The Court was not persuaded, observing that the screenings would have been after school hours, would not have been sponsored by the school, and would have been open to all members of the public.  Under these circumstances, and because a wide range of groups had used the District property in the past, "there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed, and any benefit to religion or to the Church would have been no more than incidental." *Id.* at 395, 113 S. Ct. 2141.

More recently, in *Good News Club*, 533 U.S. at 112-19, 121 S. Ct. 2093, the Supreme Court held that an elementary school would not have violated the Establishment Clause by permitting a Christian club for children ages 6 to 12 to hold meetings after school hours in the school cafeteria. The meetings, which students could attend only with parent permission, would have included children reciting and learning Bible verses, signing songs, listening to Bible stories and related lessons, and praying. *Id.* at 103, 121 S. Ct. 2093. The Court cited favorably to *Widmar* and *Lamb's Chapel*, applying them as follows:

> As in *Lamb's Chapel*, the Club's meetings were held after school hours, not sponsored by the school, and open to any student who obtained parental consent, not just to Club members. As in *Widmar*, Milford made its forum available to other organizations. The Club's activities are materially indistinguishable from those in *Lamb's Chapel* and *Widmar*. Thus, Milford's reliance on the Establishment Clause is unavailing.

*Id.* at 113, 121 S. Ct. 2093.

The Court found no basis for a distinction because the Good News Club involved elementary school children, whom the school argued would be more likely to perceive school endorsement of the group and coercive pressure to join. The Court's opinion gave five reasons for rejecting that argument. First, allowing the club to use school facilities furthered neutrality towards religion by allowing a religious group to speak on the same topics as all other groups. *Id.* at 114, 121 S. Ct. 2093. Second, to the extent coercion was an appropriate inquiry, the students could not be coerced into attendance because their parents were required to sign permission slips. The Court stated in passing that there was no suggestion that parents would think the school was endorsing religion and that no such argument "could be reasonably advanced." *Id.* at 115, 121 S. Ct. 2093. Third, after acknowledging that it may have, in the past, given weight to the impressionability of elementary school students, the Court stated that it had "never extended our Establishment Clause jurisprudence

31

to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present." *Id.* The court stated that *Lee v. Weisman*, 505 U.S. 577, 112 S. Ct. 2649 (2001) (finding Establishment Clause violation when school included a clergy-led prayer as part of a mandatory graduation ceremony), was not relevant, because the decision in that case did depend not on the fact that the graduation ceremonies were held on school grounds. The Court also rejected the school's argument based on *Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S. Ct. 2573 (1987), a case in which it had struck down a Louisiana law requiring that lessons about evolution be accompanied by a lesson on creationism. In *Edwards*, the Court emphasized the "children's susceptibility to peer pressure" as one reason why the state "exerts great authority and coercive power." *Id.* The *Good News Club* Court minimized that language because it was it was not part of the meat of the *Edwards* analysis and because it was mentioned in tandem with mandatory attendance requirements, which were not an issue for the after-school activities in *Good News Club.* 533 U.S. at 116, 121 S. Ct. 2093. The Court did not read *Edwards* as suggesting that "when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue." *Id.* But, even if *Edwards* did say that, the case was distinguishable because it involved the curriculum taught to students whose attendance was compulsory. *Id.* at 116-17, 121 S. Ct. 2093.

The fourth reason given in *Good News Club* for rejecting the school's Establishment Clause arguments was that there was no evidence to support a conclusion that the elementary school students would perceive endorsement by the school. There was no evidence that the students were permitted to linger on campus after school ended, that the meetings were held in a room ordinarily used by middle school and high school students, and that, unlike a normal elementary school class, the group ranged in age from 6 to 12. The Court also stated that "[s]urely even young children are

aware of events for which their parents must sign permission forms." *Id.* at 117-18, 121 S. Ct. 2093. Finally, the Court found that, if there was any danger of misperception by children, it was outweighed by the risk that a policy excluding the Good News Club would give those students, older students, and adults in the community the impression that the school was hostile to religion. *Id.* at 118, 121 S. Ct. 2093. Because there was no "significance in this case to the possibility that elementary school children may witness the Good News Club's activities on school premises," there was no reason to depart from the precedent established in *Widmar* and *Lamb's Chapel* and no basis to conclude that allowing the club to meet on school grounds would have violated the Establishment Clause. *Id.* at 119, 121 S. Ct. 2093.

In the present case, Pattison Elementary sent out the art-card order form home and benefitted from the funds raised. The issue is whether that act would have created a perception that the school endorsed the beliefs expressed in one statement on the form. *Widmar*, *Lamb's Chapel*, and *Good News Club* all involved a religious group that the school allowed to meet on school grounds, and the issue was whether that created the perception that the school endorsed the beliefs espoused by that group. In this case, the art-card form was clearly created by a third-party vendor for use by any organization ordering cards. The form invited parents to create the cards and send the cards themselves. The cards were not labeled or inscribed to show any school connection. The fact that the school sent the form home, inviting parents to participate by themselves choosing art work their child had created and choosing one of the preset messages, did not mean that the parents would conclude that the school specifically endorsed all or any of those messages. "[S]chools do not endorse everything they fail to censor." *Bd. of Education v. Mergens*, 496 U.S. 226, 250, 110 S. Ct. 2356 (1990).

To the extent that *Lynch* and *Allegheney County* inform this case, they do not support the contention that an unredacted art-card order form would have violated the Establishment Clause. The art-card fundraiser form with Box F included would have provided Christian families the opportunity to purchase cards they could send to others with a quotation from the Bible. The art-card fundraiser form would have also provided messages for Jewish families observing Hanukkah, for Spanish-speaking families observing Christmas, for families observing Kwanzaa, and for families preferring a secular seasonal message. As in *Lynch*, the fact that the frankly Christian part of the display—the crèche—was surrounded by more secular displays and a "SEASON'S GREETINGS" sign meant that it did not convey an endorsement of those Christian beliefs. *Lynch*, 465 U.S. at 671, 104 S. Ct. 1355. The message in Box F was a direct quote from the Gospel of Matthew, chapter 1, verse 21, which stated "And she shall bring forth a son, and thou shalt call his name Jesus; for He shall save his people from their sins." It was qualitatively different from the other messages, which were clearly more secular and cultural in nature. But the presence of Box F as one of twelve message selections would not have communicated to parents that the school accepted or endorsed the specific belief expressed in that message, in addition to, or to the exclusion of, all the other message options provided in the form.

Another Fifth Circuit case is also instructive. In *Croft*, 562 F.3d at 742, the court applied the *Lemon* test and upheld a Texas statute permitting a minute of silence in public schools against a facial challenge. *Id.* at 746-51. The statute required each school district to provide for a one-minute period in which each "student may 'as the student chooses, reflect, pray, meditate, or engage in any other silent activity that is not likely to interfere with or distract another student.'" *Id.* at 738 (quoting TEX. EDUC. CODE § 25.082(d)). The plaintiffs argued that the primary effect of the statute was to promote mainstream Protestant Christianity, while inhibiting other religions. They also

34

argued that the word "pray" in the statute conferred a benefit upon religious people "because they need not consult a lawyer to know that their children can pray during the moment of silence while non-religious people must consult a lawyer to find out that their children may 'not pray' during the same period." *Id.* at 749. The court quickly rejected the latter argument, concluding that it was "misguided" because the statute permitted students to "'engage in *any* other silent activity.'" *Id.* (emphasis original). They also found nothing in the record showing that the statute's primary effect was to advance Protestant Christianity. The statute was "facially neutral between religious and non-religious activities that students can choose to engage in during the moment of silence," and the word "pray" did not by itself serve as "an endorsement of Protestant Christianity." *Id.* Instead, the primary effect was in line with the stated legislative purposes, "fostering patriotism and mandating a moment of quiet reflection." *Id.* Finally, the court rejected the argument that the statute discriminated against religious sects that prayed by making noises or motions. The court held that this argument was a "non sequitur" because "'[t]he statute simply does not address the problem of accommodating the benefits of those whose prayer must be oral or otherwise self expressive.'" *Id.* at 749-50) (quoting *May v. Cooperman*, 780 F.2d 240, 248 (3d Cir. 1985) (striking down a moment of silence statute because it lacked a secular purpose)). The statute permissibly governed the time, place, and manner of the students' expression by permitting any nondisruptive, silent activity. *Id.* at 750. Much of the reasoning in *Croft* was animated by the silent, self-selective nature of the time provided to the students. The court quoted Justice O'Connor's concurrence in *Wallace v. Jaffree*, a case striking down a moment of silence statute for lack of secular purpose, in which she found it "difficult to discern a serious threat to religious liberty from a room of silent, thoughtful schoolchildren." 472 U.S. at 73, 105 S. Ct. 2479. It also emphasized the students' ability to pray or do some other silent act during that moment of silence.

The application of *Croft* to the present case supports the absence of an Establishment Clause violation.  In the present case, the art-card order form provided a menu of message options from which parents could choose, in the privacy of their own homes.  One option was explicitly religious and Christian.  Although the order form did not provide a blank space in which each family could include a message entirely of its choosing, the fact that the family's choice was limited to one of twelve options does not remove or lessen the significance of the wide range of choices provided.

The KISD argues that the leaving Box F in the form and allowing families to choose an explicitly religious message for the art card would not avoid an Establishment Clause violation.  This argument responds to the plaintiffs' contention that there would be no Establishment Clause violation because families receiving the order form could have made a private choice about whether to purchase cards bearing the message in Box F.  The plaintiffs' argument was in turn based on *Zelman v. Simmons-Harris*, 536 U.S. 639, 122 S. Ct. 2460 (2002), and similar cases preceding it. *Zelman* was a school voucher case.  The State of Ohio provided funds for families living in Cleveland to attend participating private schools within the city.  Each student's family was allowed to choose the school the student attended.  Of the participating schools, 82% were religiously affiliated and 96% of the students accepting vouchers attended those religious schools. *Id.* at 646-47, 122 S. Ct. 2460.  The Court held that the program did not have the effect of advancing religion.  The Court found no risk that a reasonable observer would think the voucher program was endorsing religion because it was a "neutral program of private choice, where state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals." *Id.* at 655, 122 S. Ct. 2460.  Because of the private choice, there was no "imprimatur of government endorsement." *Id.* (emphasis removed).  The KISD argues that although the art card order form with Box F gave families a menu of choices, there is still an Establishment Clause

36

violation because the form gave families a specific preset list of choices.  The Cleveland families in *Zelman* were given checks directly by the state and allowed to give them to schools of their choice, not one of several options preselected by the government. The KISD's argument is that by even presenting a religious option as one of twelve message choices on the art-card order form, the school would be perceived as endorsing that choice.  One problem with this argument is that it is inconsistent with *Lynch*, in which the inclusion of a religious symbol in a government-sponsored display did not violate the Establishment Clause, and with *Croft*, in which the inclusion of a religious choice for the moment of silence was not a violation.  A second problem with this argument is that the school is simply inviting the parent to make a choice for the parent's own, private expression—the creation of a holiday card—that would not occur at the school, have the support of school or government funds, or involve other students or teachers.  This is unlike the hypothetical provided by the KISD, in which a public school student bookstore defends its sale of rosary beads or crosses or Stars of David.  The hypothetical student bookstore is on the school campus.  It is stocked by school funds.  The choice of merchandise is clearly a statement by the school and runs afoul of the Establishment Clause for that reason.  And the students' purchase occurs at school, often in front of other students and faculty.  In the present case, by contrast, the unredacted order form is a school-transmitted form prepared by a third-party vendor for a fundraiser using art work the parents selected and using a message the parents selected.  The choice of art work and message was left to the parents to make in their own homes, to create a card that was to be made, received, and sent away from the school.     For reasons similar to those explaining why the order form, viewed in the context of the art-card program, was neither pure government speech nor school-sponsored speech, the unredacted form could not fairly have been characterized as a government endorsement of any of the messages, including the Box F message.  The

unredacted order form would not have communicated the school's endorsement of a particular religious belief.

## IV.   Conclusion

Pattison Elementary's effort to avoid a possible Establishment Clause violation led it to remove the only explicitly religious message option that a third-party offered on the holiday card order form the school sent home as a fundraiser.  The form was not pure government speech and is therefore subject to First Amendment constraints.  The KISD has admitted that its redaction of the one message option was viewpoint discrimination.  This discrimination was not justified by an interest in avoiding another constitutional violation, because including that message option would not have violated the Establishment Clause.

The plaintiffs' motion for reconsideration is granted.  The court's prior grant of summary judgment in favor of the KISD on the as-applied restrictions on student literature distribution remains.  The prior grant of summary judgment in favor of the KISD on the exclusion of a religious message from the holiday art cards is vacated.  This court concludes that based on the record, the KISD did engage in unconstitutional viewpoint discrimination not justified by the interest in avoiding an Establishment Clause violation.

The plaintiffs are ordered to submit an amended final judgment no later than **August 20, 2010.**

SIGNED on July 30, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

38